T.C. Memo. 2003-103


UNITED STATES TAX COURT


NORMAN L. AND CATHERINE J. FORSTE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12393-00.                   Filed April 16, 2003.


       Following P's assertion of numerous tort and
nontort causes of action, P and his employer entered
into a settlement.  P excluded from gross income
$45,615 that he received from his former employer under
the settlement agreement.  P claims that this amount is
excludable under sec. 104(a)(2), I.R.C., as damages
received on account of personal injuries and that the
burden of proof is on R pursuant to sec. 7491, I.R.C.

       <u>Held</u>:  Under sec. 7491(a)(1), I.R.C., if the
taxpayer produces credible evidence as to any factual
issue relevant to his tax liability, the burden of
proof as to that issue shifts to the Commissioner.
What constitutes a relevant factual issue for purposes
of sec. 7491, I.R.C., is determined on the basis of the
circumstances of the particular case and the relevant
law.  The factual issue in this case is what amount, if
any, of the $45,615 P received pursuant to the
settlement agreement was paid as damages for tort or
tort type personal injury claims.  P produced credible

evidence that $25,130 was received on account of tort or tort type personal injuries. Therefore, the burden of proof with respect to that amount shifted to R, and R did not meet his burden of proof with respect to that amount. P did not produce credible evidence with respect to the amount that he received in excess of $25,130. Thus, P bears the burden of proof regarding the amount in excess of $25,130, and P has failed to prove that this amount is excludable from gross income under sec. 104(a)(2), I.R.C.

Held, further, R is not equitably estopped from arguing that part of the settlement payment is not excluded from income under sec. 104(a)(2), I.R.C.

David M. Fogel and Robert R. Rubin, for petitioners.

Steven J. Mopsick, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, Judge: Respondent determined a deficiency of $11,576 in petitioners' Federal income tax and an accuracy-related penalty of $2,315 pursuant to section 6662(a)[1] for 1996. Respondent concedes the accuracy-related penalty. The issue for decision is whether any of the money received by Mr. Forste in 1996 as a result of a settlement between him and his former employer was properly excluded from gross income under section 104(a)(2) as damages received on account of personal injuries or sickness.

---

[1]All section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed the petition, petitioners resided in Auburn, California.

Mr. Forste is a Korean War veteran who served in the Air Force. At some point after returning from Korea and being released from active duty, Mr. Forste joined the Air Force Reserves. Following a number of frightening experiences involving aircraft flights, Mr. Forste developed an acute fear of flying.

In August 1976, Mr. Forste began work in Los Angeles as a manager for the accounting firm of Deloitte, Haskins & Sells (DHS), which later became Deloitte & Touche. Mr. Forste was engaged in a national practice in the areas of government and education. His work required him to travel to DHS's offices throughout the United States. In May 1981, DHS promoted Mr. Forste from manager to director.[2] His title was national director for government financial management systems. Following Mr. Forste's promotion to director, he signed a director

---

[2]DHS was composed of partners and directors. Partners were generally certified public accountants, whereas directors were not. Partners and directors in DHS shared in the profits of the firm.

agreement dated May 30, 1982.[3]  The director agreement was Mr. Forste's employment contract, and it provided for a term of employment that "shall extend from May 30, 1982 until the retirement or death of Director or the termination of such employment, in each case pursuant to the provisions of Section 4".  Under section 4, four types of retirement were available to DHS's directors:  (1) Mandatory retirement (age 62 with 15 years of service); (2) regular retirement (age 60 with 15 years of service); (3) early retirement (age 55 with 15 years of service); and (4) disability retirement (any age if the disability interfered with job performance).  In addition, the agreement provided that directors could retire and the policy committee of DHS could require a director to retire at any time, and the director would receive retirement income in an amount and under such conditions as might be established by the policy committee in its discretion; and further, the policy committee could require a director to terminate employment, and the director could elect to terminate employment, at any time, and the director would have no right to retirement income except in the discretion of the policy committee.

DHS was aware of Mr. Forste's fear of flying when it hired him and insisted that it could work around this problem.  DHS

---

[3]This agreement was in effect during the relevant times in this case; i.e., during 1985.

agreed that Mr. Forste would not be required to fly. Between August and November 1976, Mr. Forste flew twice as an employee of DHS. When scheduled to fly, he would have nightmares and wake up in a cold sweat nightly for approximately 2 weeks before his flight. In November 1976, Mr. Forste flew to Florida for DHS. Following an eventful return flight, he resolved never to fly again and informed one of the managing partners of his decision. He told the managing partner that if his inability to fly was a problem, he would seek other employment. DHS did not respond, and Mr. Forste continued working for DHS. Mr. Forste thereafter traveled by personal car or by train. His fear of flying and his choice of alternative modes of transportation did not interfere with his job performance, and he received only positive evaluations from DHS.

In the early part of 1983, a supervising partner in DHS told Mr. Forste that his inability to fly was an issue and that he had to fly or he would no longer be of any value to the firm. Because of the pressure to fly and the manner in which the issue was brought to Mr. Forste's attention, he experienced a great deal of stress, anguish, anxiety, fear, anger, and sleeplessness, as well as nightmares. He also experienced headaches which he treated with Tylenol and codeine. In March 1983, a psychiatrist examined Mr. Forste and diagnosed his fear of flying as an incurable form of "delayed stress syndrome". DHS was made aware

of the psychiatrist's diagnosis and the possibility that Mr. Forste's condition was permanent.

In October 1983, DHS's managing partner told Mr. Forste that he had to fly by the end of the year or else leave the firm. In November 1983, Mr. Forste wrote a letter to DHS regarding his fear of flying, expressing his dissatisfaction with the firm's decision, and suggesting that he be granted a disability retirement. In December 1983, DHS restricted Mr. Forste's work area to northern California and limited his practice area to education. In February 1985, DHS told Mr. Forste of its decision that he had to leave the firm. DHS cited his fear of flying as a problem with which it could not cope. DHS initially offered Mr. Forste $30,000 in severance pay. He rejected that offer. Mr. Forste's annual salary was $69,000 in 1985.

Mr. Forste became very upset about DHS's decision, and he contemplated suicide. He engaged an attorney, who sent a letter to DHS dated March 11, 1985, raising a number of tort and nontort causes of action and seeking a settlement of the employment dispute. Those causes of action included breach of contract, misrepresentation, failure to accommodate Mr. Forste's disability, unlawful termination due to disability, and intentional or negligent infliction of emotional distress. The letter states with respect to potential causes of action:

> Our law firm has advised Mr. Forste that he has substantial legal rights in his employment with

Deloitte Haskins & Sells and that Deloitte Haskins & Sells has substantial legal obligations to Mr. Forste. A few of these rights are listed below.

1.  We believe Mr. Forste has a cause of action against Deloitte Haskins & Sells for breach of contract.  He came to your firm with the clear understanding that he could not fly in an airplane. Based upon that understanding, he gave his most productive years of his career and because of a change of thinking he is now put in a position where he will enter into the job market at an advanced age with far less attractiveness to a prospective employer.

2. We believe Mr. Forste has a cause of action against your firm for misrepresentation based upon the promise that his inability to fly in an airplane would not hinder his employment with Deloitte Haskins & Sells.

3. We believe if Mr. Forste is to be terminated, such termination should be based upon a certifiable material disability, to wit his fear of flying.  We believe your firm is under the duty, pursuant to Federal law, to make all reasonable accomodations [sic] to provide for this disability.  Failure to do this subjects your firm to substantial liability to Mr. Forste as well as to federal agencies.

4. We believe that Mr. Forste has a substantial cause of action for the intentional and/or negligent infliction of mental distress.  Your firm has constantly subjected Mr. Forste and his family to fear of loss of job and security because of his inability to fly in an airplane.

5. We believe that the procedural provisions of the contract between your firm and Mr. Forste regarding termination of employment have not been satisfied and would have to be satisfied before Mr. Forste could be terminated.

Following DHS's receipt of this letter, it informed Mr. Forste that he would have to deal with Mike Cook, the chief operating officer or number two man in DHS.  Mr. Forste wrote a

letter to Mr. Cook and requested that he be given a disability retirement. DHS then contacted Mr. Forste and commenced negotiations for his termination. The negotiations occurred between Mr. Forste and his attorney and James R. Ladd. Mr. Ladd was the national personnel partner for DHS in New York and was its top human resources person.

Between May and August 1985, Mr. Forste and DHS exchanged numerous drafts (seven) of a proposed settlement agreement.[4] On May 10, 1985, DHS proposed that Mr. Forste receive a regular retirement as if he were 60 years of age; i.e., Mr. Forste would receive $25,130 of retirement income per year. The proposal from DHS stated in relevant part:

> As discussed with Jim Ladd, I request that I be allowed to retire as of June 1, 1985, under the following terms.
>
> 1. I will receive retirement income under the terms of Section 4(a) of my Director's Agreement as if I had worked with the firm until I had attained age 60. This will amount to $25,130 per year; * * *
>
> 2. I will receive additional payments through May 31, 1986 that, when combined with my retirement income, will equal my current rate of base salary.
>
>        *    *    *    *    *    *    *
>
> 10. In consideration of DH&S accepting the terms set forth in paragraphs 1 through 5, and when DH&S accepts these terms, I will forever release any and all rights, claims or causes of action I have

---

[4]Each draft was in the format of a letter addressed to Mr. Charles G. Steele, chairman and chief executive officer of DHS, from Mr. Forste.

> or may have against DH&S (or against any of its partners, directors or employees) relating to, arising out of, or based upon my employment by DH&S, my tenure as a director of DH&S, services performed by me in my capacity as an employee or director of DH&S, or the termination of my employment by or tenure as a director with DH&S, except the right to enforce the obligations of DH&S to me provided by this agreement.

This settlement offer was better than what Mr. Forste was entitled to, given his age. Mr. Forste did not accept DHS's proposal, and he instead made numerous handwritten changes to its language. Notably, he changed the language in paragraph 1 to read: "I will receive disability retirement income under the terms of Section 4(d) of my Director's Agreement". However, DHS was unwilling to discuss a disability retirement.

In June 1985, Mr. Forste drafted two proposals which he submitted to DHS. The first proposal contained the language "In settlement of all claims arising from the severance of my employment with DH&S", and the second proposal contained the language "In settlement of all claims for personal injuries and/or damages arising from my termination of employment with DH&S". On June 15, 1985, DHS proposed a structured settlement. Paragraph 1 provided for payments of $25,130 per year to be adjusted as provided in paragraph 2.e. Paragraph 1 of the proposal contained the language "In settlement of all claims for personal injuries and/or damages arising from my termination of employment with DH&S". In another draft, DHS included the

following language in paragraph 1: "It is expressly understood that the above payment is made to compromise and release what are substantial tort claims being made against DH&S by me." Mr. Forste deleted this.[5] On the advice of a certified public accountant, Mr. Forste changed the language in paragraph 1 to refer to "Workmen's Compensation" instead of "personal injuries". Mr. Forste did not file a workers' compensation claim relating to his dispute with DHS, and it does not appear that he informed DHS of any intention of filing such a claim.

The parties entered into an agreement dated September 27, 1985,[6] which stated:

1. In settlement of all claims for Workmen's Compensation arising from my employment or termination with DH&S, and without DH&S admitting any liability, and expressly denying any liability for any and all claims which may be or are claimed to result from my employment or termination with DH&S, in lieu of a lump sum settlement, DH&S will provide me with a structured settlement providing for annual compensation payments of $25,130 (to be adjusted as described in paragraph 2.e. below) payable in bi-weekly installments commencing immediately upon the effective date of my termination, and continuing until my death or my election under paragraph 2.c. below.

2. In addition, as additional compensation for other claims and entitlements, DH&S agrees to provide me with:

---

[5]Paragraph 2 of the same draft begins: "In addition, as compensation for other non-tort claims and entitlements, DH&S agrees to provide me with:".

[6]This agreement was accepted by DHS on Oct. 10, 1985.

a.   Additional claims payments through May 31,
     1986, that when combined with the
     compensation payments described above, will
     equal my current rate of salary.

b.   Additional claims payments in any calendar
     year in which, until I reach age 62, the
     total of my salaries, wages, and net business
     income, plus compensation payments from DH&S
     (as provided in paragraphs 1. and 2.a. above)
     does not equal or exceed $42,000, such
     additional claims payments to bring the total
     to $42,000 (I will submit signed copies of my
     Federal income tax returns to substantiate
     requests for payments under this clause).

c.   The option at age 60, to elect a 50% "joint
     and survivor annuity" option based upon the
     same terms as available under my Director
     Agreement and thereby reduce the annual
     compensation payments during my remaining
     life (from $25,130 to $22,115 at present
     rates, to be adjusted as described in
     paragraph 2.e. below) and, upon my death,
     provide my surviving spouse with annual
     compensation payments of half that amount
     ($11,058 at present, to be adjusted as
     described in paragraph 2.e. below).

d.   The opportunity to continue to elect DH&S
     group health and life insurance under the
     same terms as available to Directors retiring
     this year at age 60.

e.   Annual adjustments to the amounts of the
     compensation payments described in paragraphs
     1. and 2.c. above, based upon the same
     computations of average annual income as will
     be used for Directors who retired in 1985
     under the terms of my Director Agreement.

f.   Payment of the same Net Supplemental
     Compensation Award for the fiscal year ended
     June 1, 1985, as would have been paid to me
     if I were not terminating my employment with
     DH&S.

g.   Payment of a Special Compensation Award of $5,000 for the fiscal year ended June 1, 1985.

h.   Payments of any amounts from the termination of the Partner/Director's retirement fund which would be paid to me if I were not terminating my employment with DH&S.

i.   Payment of any unpaid installments of Net Supplemental Compensation Award and Special Compensation Award at any time I request after June 1, 1985.

j.   Reimbursement for my personal legal expenses incurred to date (maximum of $8,000) in connection with the termination of my employment with DH&S.

        *     *     *     *     *     *     *

5.   In consideration of our mutual acceptance of the terms set forth above and when DH&S accepts these terms, DH&S and its predecessors, successors and assigns will forever release me and my heirs, executors, administrators and assigns, and I and my heirs, executors, administrators and assigns will forever release DH&S and its predecessors, successors, assigns, and present or former partners, directors or employees from all rights, claims or causes of action which we have or may have against each other relating to, arising out of, or based upon my employment by DH&S, my tenure as a director of DH&S, services performed by me in my capacity as an employee or director of DH&S, or the termination of my employment by or tenure as a director of DH&S, except the right to enforce the mutual obligations provided by this agreement.

The agreement was entered into in an adversarial context, at arm's length, and in good faith. At no time during the negotiations leading up to this agreement did Mr. Forste submit any documents to DHS to substantiate any specific amount for personal injuries. Mr. Forste never informed DHS that he was

having nightmares and headaches or that the prospect of losing his job caused him to contemplate suicide.

At some point before Mr. Forste entered into the agreement with DHS in 1985, DHS adopted a nationwide plan to reduce by 10 percent the number of its partners and directors.[7] Mr. Ladd was responsible for negotiating with the targeted partners and directors. Mr. Forste was at all relevant times completely unaware of the existence of this plan. As part of the plan, DHS offered a retirement package for those "targeted" partners and directors who were age 50 or older.[8] DHS asked those targeted employees who were younger than age 50 to resign, and in exchange, it offered to pay them a severance of up to 1 year's salary.[9] Unbeknownst to Mr. Forste, he was targeted as one of the directors to be forced out of the firm. He was only 49 years old at the time, and he was not eligible for any early retirement package.

---

[7]During 1985, there were 95 partners and directors who either resigned or were given retirement at DHS.

[8]Early retirement was normally available only to persons who were age 55. As an incentive for the early retirement of its partners and directors, DHS modified the eligibility requirements under the directors agreement: DHS added 5 years to the age of targeted employees and reduced their service requirement from 15 to 5 years.

[9]Mr. Ladd testified that because DHS was a partnership, partners and directors were asked to resign. They were not fired.

Mr. Forste received payments under the agreement with DHS in 1990, 1992, 1993, and 1996.  DHS issued Forms W-2, Wage and Tax Statement, to Mr. Forste for those years.  On those forms, DHS reported taxable income in the full amounts of the annual settlement payments, and it withheld taxes.  Petitioners excluded the payments received in 1990, 1992, and 1993 on their joint Federal income tax returns for those years.  Petitioners attached to their 1992 and 1993 joint Federal income tax returns supplemental statements regarding the amounts received in those taxable years from DHS.  The supplemental statements state that "the money reported in salary for Norman L. Forste was paid to him because of a medical problem that prevented him from working at his prior position."

Respondent audited petitioners' returns for 1990, 1992, and 1993 but in each case conceded that the payments from DHS were excludable from gross income.

Respondent issued a notice of deficiency with respect to petitioners' 1990 taxable year in which he determined that the amount received from DHS in that year was taxable.  Petitioners filed a Tax Court petition with respect to the deficiency respondent determined for the 1990 taxable year.  In that petition, petitioners alleged that the payments from DHS were nontaxable income.  A Form 3100, Appeals Division Feedback Report and Transmittal Memorandum, dated July 12, 1993, states "included

in W-2--allowed" with respect to the payments from DHS. The record does not disclose the basis for respondent's allowing the DHS settlement amount to be excluded in 1990 or the information that respondent relied upon in making his concession. On January 11, 1994, the Tax Court entered a stipulated decision of no deficiency in income tax for petitioners' 1990 taxable year.

With respect to the audit of the 1992 return, a Form 4700, Examination Workpaper, dated March 31, 1994, and completed by respondent's agent, states:

> T/P received W-2 from Deloitte & Touche in amt. of $41,999.38--list'd as income line 7 of rtrn. deleted as taxable income line 22 of rtrn--T/p received structured settlement providing for annual compensation payments from ex-employer in settlement of all claims for Wormen's [sic] Compensation--T/ps have been deleting as income since 1985. Per audit of 9012--determined not taxable income.

The issue regarding the taxability of the amount received from DHS appears to have been resolved before the issuance of the notice of deficiency for 1992.

A document contained in respondent's audit file regarding petitioners' 1993 taxable year states that "Per District Counsel settlement in prior year, TPH is authorized to declare as non-taxable income the amounts reported on W-2 from Deloitte & Touche. Issue is no-changed." In connection with the audit of the 1993 return, respondent's tax auditor sent petitioners a letter dated February 12, 1996, advising them that the payments from DHS were excludable from gross income and that they should

attach certain documents to future tax returns to avoid any
further audits with respect to this issue.  The letter states in
pertinent part:

> The attached report reflects the information
> regarding the taxability or non-taxability of the
> $40,000 income from Deloitte & Touche.  We have
> received the additional information (court decision)
> from Mr. McDonald [petitioners' representative] that
> validates the entries on line 22 of your 1992 Federal
> Income Tax return.

> We recommended to Mr. McDonald that a copy of the
> court decision be attached to each year's return so as
> to avoid a continuous repetition of IRS contact
> regarding this issue.

In 1996, Mr. Forste received $45,615 from DHS (then Deloitte
& Touche).  Petitioners excluded this amount from gross income on
their Federal income tax return for 1996.  An attachment to the
return states that the amount received from DHS was "Workmens
Compensation and non-taxable".  Petitioners followed respondent's
tax auditor's advice in the February 12, 1996, letter, and they
attached the letter from respondent's tax auditor, their petition
to the Tax Court for that year, and the first page of their 1990
return to their 1996 return.[10]

Respondent commenced an examination of petitioners' 1996
return at some point after July 22, 1998.  He subsequently issued
a notice of deficiency to petitioners for 1996 in which he

_____

[10]The parties stipulated a copy of petitioners' joint
Federal income tax return for 1996.  The copy of the return in
the record does not have attached the Tax Court decision for
petitioners' 1990 taxable year.

determined that the $45,615 was not excludable under section 104. Petitioners have cooperated with all respondent's requests for meetings, interviews, witnesses, information, and documents, including providing, within a reasonable time, access to and inspection of witnesses, information, documents within petitioners' control, and assistance in obtaining access to such items not within petitioners' control.

OPINION

Gross income includes all income from whatever source derived, including pensions and compensation for services. Sec. 61(a). However, section 104 provides for certain specific exclusions from gross income. The issue in this case is whether petitioners are entitled to exclude all or a part of the $45,615 that Mr. Forste received in 1996 pursuant to a structured settlement agreement. Petitioners excluded the entire amount on their joint Federal income tax return for 1996. Respondent determined that no part of that amount is excludable from gross income.

I. Burden of Proof--Section 7491

It is well established that statutory exclusions are to be construed narrowly, see Commissioner v. Schleier, 515 U.S. 323, 328 (1995), and the taxpayer bears the burden of showing that he falls squarely within the requirements for the exclusion. However, under section 7491(a)(1), if, in any court proceeding, a

taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B of the Code, the burden of proof as to that issue is on the Commissioner.[11]  Sec. 7491(a)(1); Nis Family Trust v. Commissioner, 115 T.C. 523, 538 (2000).  Section 7491(a)(2) specifies certain requirements that must be met for section 7491(a)(1) to apply.  Respondent does not argue that petitioners failed to satisfy the requirements of section 7491(a)(2) and has stipulated facts showing that petitioners have satisfied the requirements of section 7491(a)(2).[12]  Thus, section 7491(a)(1) applies to this case.  If petitioners introduced credible evidence with respect to any factual issue relating to their tax liability, the burden of proof is on respondent with respect to that factual issue.

[11]Sec. 7491(a), which is titled "Burden Shifts Where Taxpayer Produces Credible Evidence", was added to the Code by the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA 1998), Pub. L. 105-206, sec. 3001, 112 Stat. 726.  Sec. 7491(a) applies with respect to examinations that are commenced after July 22, 1998.  RRA 1998 sec. 3001(c), 112 Stat. 727.  The examination in this case commenced at some point after July 22, 1998.

[12]As relevant herein, sec. 7491(a)(2) provides that sec. 7491(a)(1) shall apply with respect to an issue only if "the taxpayer has complied with the requirements under this title to substantiate any item" and "the taxpayer has maintained all records required under this title and has cooperated with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews".

Section 7491 does not define what constitutes credible evidence; however, the conference report preceding enactment of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, 112 Stat. 685, states:

> Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness). A taxpayer has not produced credible evidence for these purposes if the taxpayer merely makes implausible factual assertions, frivolous claims, or tax protestor-type arguments. The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief. If after evidence from both sides, the court believes that the evidence is equally balanced, the court shall find that the Secretary has not sustained his burden of proof. [H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995.]

We have applied this definition in cases involving section 7491. See Higbee v. Commissioner, 116 T.C. 438, 442-443 (2001) (quoting legislative history and deciding taxpayers' evidence did not meet requirements of section 7491(a)). Also, in Managan v. Commissioner, T.C. Memo. 2001-192, a case involving a claimed exclusion under section 104(a)(2), we held:

> In order for respondent to have the burden of proof on a factual issue, petitioner must introduce credible evidence relating to the issue. Sec. 7491(a). Evidence is credible if a court would find it "sufficient upon which to base a decision on the issue if no contrary evidence were submitted". Higbee v. Commissioner, 116 T.C. ___, ___ (2001) (slip op. at 8) (quoting H. Conf. Rept. 105-599 at 240 (1998), 1998-3 C.B. 755, 994). * * *

We apply the definition suggested by the legislative history.[13]

II.  Factual Issue in This Case

We now proceed to define the factual issue in this case, for purposes of applying section 7491, on the basis of the circumstances and the relevant law.[14]

On petitioners' joint Federal income tax return for 1996, they excluded the $45,615 that Mr. Forste received from DHS. Petitioners attached a statement to their return in which they claimed that amount to be "Workmens Compensation and non-taxable."  Section 104(a)(1) provides an exclusion from gross income for amounts received under workers' compensation acts as

---

[13]In a recent opinion discussing the application of sec. 7491, the Court of Appeals for the Eighth Circuit adopted this definition of credible evidence, the same definition that was suggested by the Commissioner and which we applied in that case:

> In interpreting the term "credible evidence" in § 7491(a)(1), we adopt the definition suggested by the Commissioner, which is sensible, consistent with the law's underlying purpose, and derived from the legislative history.  [Citation omitted.]  Accordingly, we hold that "credible evidence," for purposes of interpreting and applying § 7491(a)(1), is "the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)."  Brief for Appellee at 22 * * *; accord Okerlund v. United States, 53 Fed. Cl. 341, 356 n. 23 (Fed. Cl. 2002) (adopting same definition based upon legislative history).  [Griffin v. Commissioner, 315 F.3d 1017, 1021 (8th Cir. 2003), revg. T.C. Memo. 2002-6.]

[14]We do not, in this opinion, attempt to define what is a "factual issue" in other contexts.

compensation for personal injuries or sickness.  However, petitioners do not argue on brief that the amount they received from DHS in 1996 is excludable under section 104(a)(1) as an amount received under a workers' compensation act.[15]

Petitioners argue that the amount Mr. Forste received from DHS pursuant to the settlement agreement is excludable under section 104(a)(2).  Pursuant to section 104(a)(2), gross income does not include the amount of any damages received on account of personal injuries or sickness, regardless of whether the amount is received by suit or agreement and whether received in lump sums or as periodic payments.  Damages are excludable under section 104(a)(2) provided:  (1) The underlying cause of action is based upon tort or tort type rights; and (2) the damages were

---

[15]The regulations promulgated under sec. 104(a)(1) exclude amounts received under a statute in the nature of a workers' compensation act which provides compensation to employees for personal injuries or sickness incurred in the course of employment.  Sec. 1.104-1(b), Income Tax Regs.  Mr. Forste did not file a claim for workers' compensation benefits.  Petitioners did not offer any evidence that they had any arguable claim against DHS for workers' compensation, nor do they make any argument on brief that the amount at issue was received under a workers' compensation act.  The amount in issue was received under a settlement agreement between DHS and Mr. Forste.  An agreement standing alone does not qualify as a "statute" for purposes of the regulations under sec. 104(a)(1).  See Wallace v. United States, 139 F.3d 1165, 1167 (7th Cir. 1998) ("courts have always emphasized that the phrases 'workers' compensation acts' and 'statute in the nature of a workmen's compensation act' refer exclusively to legislative and administrative enactments"); Rutter v. Commissioner, 760 F.2d 466, 468 (2d Cir. 1985), affg. T.C. Memo. 1984-525.

received on account of personal injuries or sickness.

Commissioner v. Schleier, 515 U.S. at 337.

Where an amount is received pursuant to a settlement agreement, the proper focus is on the nature of the claim that was the actual basis for settlement.[16]  United States v. Burke, 504 U.S. 229, 237 (1992); Seay v. Commissioner, 58 T.C. 32, 37 (1972).  This determination is factual and is generally made by reference to the settlement agreement in light of the surrounding circumstances.  Robinson v. Commissioner, 102 T.C. 116, 126 (1994), affd. in part, revd. in part on another ground and remanded 70 F.3d 34 (5th Cir. 1995).  The critical question is, in lieu of what was the settlement amount paid?  Bagley v. Commissioner, 105 T.C. 396, 406 (1995), affd. 121 F.3d 393 (8th Cir. 1997).  To be excluded under section 104(a)(2), the settlement amount must have been paid in settlement of the tort or tort type claims of Mr. Forste, and it must have been received on account of his personal injuries.  See D'Amico v. Commissioner, T.C. Memo. 1999-374.

A "tort" is "a 'civil wrong, other than breach of contract, for which the court will provide a remedy in the form of an action for damages.'"  United States v. Burke, supra at 234.

---

[16]In the context of a settlement agreement, sec. 104(a)(2) requires only a claim that is bona fide and does not require a claim which is sustainable.  See Stocks v. Commissioner, 98 T.C. 1, 10 (1992); Sodoma v. Commissioner, T.C. Memo. 1996-275, affd. without published opinion 139 F.3d 899 (5th Cir. 1998).

"[O]ne of the hallmarks of traditional tort liability is the availability of a broad range of damages to compensate the plaintiff 'fairly for injuries caused by the violation of his legal rights.'"  Id. at 235.  Those damages include not only compensatory damages, but damages that "redress intangible elements of injury", e.g., emotional distress and pain and suffering.  Id. at 235-237.

The initial letter from Mr. Forste's attorney to DHS alleged numerous causes of action, some of which sound in tort and others of which involve nontort or contract rights.  The claims for intentional and negligent infliction of emotional distress involve tort rights.[17]  Petitioners argue that the personal injuries in this case include emotional distress.

The Small Business Job Protection Act of 1996 (SBJPA), Pub. L. 104-188, sec. 1605(a), 110 Stat. 1838, amended section 104(a)(2) to limit the exclusion to amounts received for personal physical injuries or physical sickness.  However, that amendment does not apply to any amount received under a written binding agreement in effect on September 13, 1995.  SBJPA sec.

---

[17]For purposes of determining whether the underlying causes of action involve tort or tort type rights, we look to State law. Pipitone v. United States, 180 F.3d 859, 862 (7th Cir. 1999); Bland v. Commissioner, T.C. Memo. 2000-98.  To that end, California recognizes tort causes of action for both intentional infliction of emotional distress, see Cervantez v. J.C. Penney Co., 595 P.2d 975 (Cal. 1979), and negligent infliction of emotional distress, see Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc., 770 P.2d 278 (Cal. 1989).

1605(d)(2), 110 Stat. 1839.  Accordingly, the amended version of section 104(a)(2) does not apply to this case.  Before Congress amended section 104(a)(2) in 1996 to limit the exclusion to amounts received for physical personal injuries, the U.S. Supreme Court interpreted section 104(a)(2) to encompass harms both tangible and intangible, both physical and nonphysical.  Commissioner v. Schleier, supra at 329 n.4; see also United States v. Burke, supra at 235-236; Roemer v. Commissioner, 716 F.2d 693, 697 (9th Cir. 1983), revg. 79 T.C. 398 (1982); Bland v. Commissioner, T.C. Memo. 2000-98.  Intangible harms recognized as within the scope of the statute include those affecting emotions, reputation, or character.  United States v. Burke, supra at 235 n.6.  Further, the intangible harms of discrimination, e.g., emotional distress, can constitute personal injuries, and compensation for such harms may be excludable under section 104(a)(2).  Commissioner v. Schleier, supra at 332 n.6.  The parties stipulated that Mr. Forste "became extremely distressed at being pressured to fly; he was terrified by the thought of flying" and "started having nightmares again and developed headaches which required that he take Tylenol with codeine."  Mr. Forste contemplated suicide as a result of DHS's actions.  Mr. Forste's claims of emotional distress qualify as claims for personal injuries for purposes of this case.

The breach of contract and the misrepresentation claims do not sound in tort, and to the extent that the agreement with DHS was made to satisfy those claims, any settlement proceeds would not be excludable under section 104(a)(2).  See Metzger v. Commissioner, 88 T.C. 834, 848-850, 858 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); Reisman v. Commissioner, T.C. Memo. 2000-173, affd. without published opinion 248 F.3d 1151 (6th Cir. 2001).

The record in this case shows numerous potential reasons for DHS to enter into the settlement agreement, including the settlement of tort or tort type personal injury claims.  It appears that Mr. Forste's assertion of his tort or tort type personal injury claims influenced and expedited DHS's decision to negotiate the settlement with Mr. Forste.  Thus, we cannot agree with respondent's suggestion that the only reasons that DHS entered into the agreement with Mr. Forste were to provide a severance, to terminate a targeted employee, and to settle the breach of contract claim.  The evidence in the record demonstrates that Mr. Forste asserted several tort or tort type claims, those claims involve personal injuries for purposes of section 104(a)(2), and at least a portion of the settlement in this case was made to settle those claims.  However, our inquiry does not end there.

In the case of a settlement agreement, we have previously held that the taxpayer bears the burden of establishing the specific portion of the settlement amount, if any, which was paid on account of personal injuries or sickness arising from tort or tort type rights. For example, in Broedel v. Commissioner, T.C. Memo. 2001-135, we held:

> In order to exclude any portion of the $58,372.50 under section 104(a)(2), petitioners must show that the payments were received on account of personal injuries or sickness, and they must establish what portion of the payments, if any, was paid on account of personal injuries or sickness arising from tort or tort type rights. * * *

In Taylor v. Commissioner, T.C. Memo. 1999-323, affd. without published opinion 246 F.3d 676 (9th Cir. 2000), we held that "Petitioner has failed to establish what part, if any, of the settlement amount here was based upon tort or tort type rights and was received on account of personal injuries." Also, in Adams v. Commissioner, T.C. Memo. 1997-357, we held:

> If a settlement is attributable to claims based on tort or tort type rights as well as other rights, the taxpayer bears the burden of establishing which portion of the settlement is attributable to damages received based upon tort or tort type rights. Similarly, if the settlement may be attributable to damages received for personal injuries or sickness as well as other damages, the taxpayer bears the burden of establishing which portion of the settlement is attributable to damages received for personal injuries or sickness. [Citations omitted.]

In those cases where a settlement agreement fails to allocate the proceeds to specific tort or tort type personal injury claims and

the taxpayer otherwise fails to establish the specific portion of the settlement amount, if any, that was paid on account of those claims, the entire amount has been held to be taxable.[18]  See Pipitone v. United States, 180 F.3d 859, 865 (7th Cir. 1999); Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994); Broedel v. Commissioner, supra; Laquaite v. Commissioner, T.C. Memo. 2000-103; Phillips v. Commissioner, T.C. Memo. 1997-336; Sodoma v. Commissioner, T.C. Memo. 1996-275, affd. without published opinion 139 F.3d 899 (5th Cir. 1998).[19]  On the basis of the

---

[18]This follows from the rule that a general release of tort and nontort claims does not satisfy the requirements of sec. 104(a)(2) in the absence of some express allocation or other evidence of payor intent.  See Ball v. Commissioner, 163 F.3d 308 (5th Cir. 1998), affg. T.C. Memo. 1997-549; Bland v. Commissioner, T.C. Memo. 2000-98; Sherman v. Commissioner, T.C. Memo. 1999-202; Brennan v. Commissioner, T.C. Memo. 1997-317.

[19]For example, in Sherman v. Commissioner, supra, we held:

As in Taggi, the release in this case is all-encompassing and includes different potential tort and nontort claims.  As stated, no part of the payment was allocated to any one cause of action.  And, petitioner has not proven which portion, if any, of the $207,000 was received in settlement of tort or tort type claims of personal injury. * * *

In Wise v. Commissioner, T.C. Memo. 1998-4, we held:

Petitioners have not proven what portion, if any, of the $1,125,000 payment was received in settlement of tort or tortlike claims.  * * *  And failure to show the specific amount of the payment allocable to the claims of tort or tortlike damages for personal injuries results in the entire amount's being presumed not to be excludable.  See Taggi v. United States, 35 F.3d 93, 96 (2d Cir. 1994); Getty v. Commissioner, 91

(continued...)

facts of this case and in accordance with the previously cited cases, we hold that the factual issue upon which petitioners must present credible evidence for purposes of section 7491(a) is <u>what portion, if any, of the $45,615 payment from DHS was received in settlement of Mr. Forste's tort or tort type personal injury claims</u>.

III.   <u>Whether Petitioners Presented Credible Evidence</u>

Where there is an express allocation contained in a settlement agreement between the parties, it will generally be followed in determining the amount which is received in settlement of tort or tort type claims for personal injuries, provided the agreement is entered into by the parties in an adversarial context at arm's length and in good faith.  <u>Bagley v. Commissioner</u>, 105 T.C. at 406; <u>Robinson v. Commissioner</u>, 102 T.C. 116 (1994).

Petitioners contend that the agreement between Mr. Forste and DHS contains an express allocation in paragraph 1.  They rely

_____

[19](...continued)
T.C. 160, 175-176 (1988), affd. on this issue and revd. on other issues 913 F.2d 1486 (9th Cir. 1990).

Also, in <u>Keel v. Commissioner</u>, T.C. Memo. 1997-278, we held:

Petitioners have the burden of proving the specific amounts of the payments allocable to claims of tort or tort-type damages for personal injuries. Failure to meet this burden results in the entire amount's being presumed not to be excludable. * * * [Citations omitted.]

on the words "Workmen's Compensation", which appear in that paragraph, and claim those words "clearly indicated that payments under this paragraph were intended to compensate petitioner for personal injuries." Petitioners contend that use of the words "Workmen's Compensation" instead of the words "personal injuries" is "of little moment because workers' compensation by definition covers on-the-job personal injuries." These contentions, however, do not establish the applicability of section 104(a)(2).

Settlement amounts which are paid to settle workers' compensation claims are not excludable from gross income under section 104(a)(2).[20] It is true that workers' compensation claims involve personal injuries which arise from and in the course of employment. See, e.g., Take v. Commissioner, 804 F.2d 553, 557 (9th Cir. 1986), affg. 82 T.C. 630 (1984). However, claims for workers' compensation do not necessarily involve tort or tort type rights. A worker's compensation claim is not itself a tort or tort type cause of action since its compensatory

---

[20]See sec. 1.104-1(c), Income Tax Regs., which provides:

(c) Damages received on account of personal injuries or sickness.--Section 104(a)(2) excludes from gross income the amount of any damages received (whether by suit or agreement) on account of personal injuries or sickness. The term "damages received (whether by suit or agreement)" means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution. [Emphasis added.]

elements involve fixed awards[21] and since it is based on no-fault principles.  See Kane v. United States, 43 F.3d 1446, 1449 (Fed. Cir. 1994); Take v. Commissioner, supra at 557.  It follows that an allocation in a settlement agreement to a worker's compensation claim is not conclusive as to the amount that was paid in settlement of tort or tort type personal injury claims. Thus, we cannot agree that the settlement agreement between DHS and Mr. Forste, on its face, provides an express allocation between tort or tort type claims and nontort claims.

In the absence of an express allocation, we must examine all the facts and circumstances to determine what portion, if any, of the $45,615 from DHS was paid to settle Mr. Forste's tort or tort type personal injury claims.  See Robinson v. Commissioner, supra at 127.  The intent of the payor is critical in determining whether an amount is excludable.  Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Stocks v. Commissioner, 98 T.C. 1, 10 (1992).  Our resolution of what portion, if any, of the $45,615 payment was intended to settle tort or tort type personal injury claims presents us with a very difficult task because of ambiguities inherent in the facts in this case.

---

[21]See United States v. Burke, 504 U.S. 229, 234-237 (1992) (discussing the compensatory elements of a tort or tort type claim).

Paragraph 1 of the settlement agreement specifies that it provides the settlement terms for all claims for "Workmen's Compensation". Paragraph 1 provides for annual "payments of $25,130 (to be adjusted as described in paragraph 2.e.)". As we have already discussed, the inclusion of the "workmen's compensation" language in paragraph 1 of the final agreement is not an express allocation of settlement proceeds to a tort or tort type personal injury. Indeed, if paragraph 1 is read literally as a settlement for workers' compensation claims, the amount paid pursuant to paragraph 1 would not qualify for exclusion under section 104(a)(2).[22] However, the inclusion of that language appears to have been a last minute change initiated by Mr. Forste on the faulty advice of his accountant. DHS did not suggest that language, and its inclusion is inconsistent with the previous drafts of the settlement agreement. There is no evidence in the record that Mr. Forste or DHS had previously contemplated the existence of a workers' compensation claim in the settlement negotiations, and respondent makes no argument that paragraph 1 was intended to settle any claims for workers' compensation. We therefore do not construe the inclusion of the "workmen's compensation" language in the final agreement to

---

[22]See sec. 1.104-1(c), Income Tax Regs., which provides that workers' compensation does not qualify for exclusion under sec. 104(a)(2).

reflect DHS's intentions to settle any workers' compensation claims.

DHS's first proposal offers $25,130 per year as retirement income under the terms of section 4(a) of the director's agreement.  Mr. Forste's handwritten changes propose $25,130 per year as disability retirement income under section 4(d) of the director's agreement.  DHS rejected this.  Mr. Forste then proposed $25,130 per year "In settlement of all claims arising from the severance of my employment with DH&S" and $25,130 per year "In settlement of all claims for personal injuries and/or damages arising from my termination of employment with DH&S".  DHS chose the latter language.  Subsequent drafts from DHS use the "personal injury" language in paragraph 1.  One of those drafts from DHS also proposed the following language in paragraph 1:  "It is expressly understood that the above payment is made to compromise and release what are substantial tort claims being made against DH&S by me."  Mr. Forste crossed out this provision in DHS's draft.  Paragraph 2 of the same draft begins:  "In addition, as compensation for other non-tort claims and entitlements, DH&S agrees to provide me with:".

In DHS's final draft proposal, which encompasses the amount of compensation ultimately used in the final settlement, DHS proposed that the $25,130 to be paid to Mr. Forste be in settlement for personal injuries.  All the drafts that

immediately precede the final settlement agreement indicate that DHS intended that the settlement amount in paragraph 1 be allocated to tort type claims involving personal injuries. Those interim drafts were exchanged as part of the arm's-length negotiations between DHS and Mr. Forste.[23]

In the final stage of the settlement with DHS, Mr. Forste, on the advice of an accountant, changed the proposed personal injury language to "Workmen's Compensation". DHS agreed to that change. The final agreement thus provides $25,130 per year "In settlement of all claims of Workmen's Compensation arising from my employment or termination with DH&S". While the "workmen's compensation" language in paragraph 1 of the settlement agreement does not mandate a conclusion that $25,130 of the payments from DHS was on account of tort type personal injuries, in the context of this case, we think it is supportive of that conclusion. As previously noted, workers' compensation is intended to compensate employees for personal injury or sickness incurred in the course of their employment. Although workers' compensation is paid on a no-fault basis, workers' compensation is traditionally viewed as a substitute for employers' direct liability for tort damages.

---

[23]The record reflects that tax considerations played some role in Mr. Forste's approach to the negotiations with DHS. However, tax considerations alone are not conclusive regarding the intent of the payor where, as here, the negotiations were held in an adversarial context and at arm's length. See Maxwell v. Commissioner, 95 T.C. 107, 123 (1990).

We find that this, combined with DHS's proposals in the interim drafts indicating its intent to provide $25,130 annual payments to Mr. Forste in settlement of all claims for personal injuries, is evidence that the payments under paragraph 1 were intended as compensation for tort or tort type personal injury claims for which DHS could have been directly liable.

Respondent's primary argument on brief is that all the payments by DHS are simply retirement benefits. It is true that DHS's first proposal characterizes the $25,130 as a retirement benefit. Even though Mr. Forste rejected this, respondent argues that the $25,130 provided in paragraph 1 of the settlement agreement appears to have been calculated by reference to the retirement provisions of the director's agreement. On the other hand, Mr. Forste was not eligible for a regular or early retirement. At age 49, he was eligible only for a severance payment of up to 1 year's salary ($69,000). DHS rejected the idea of giving Mr. Forste a disability retirement, and in its subsequent draft proposals DHS characterized its $25,130 offer as being for personal injuries. Thus, it is reasonable to infer that DHS did not intend that payments pursuant to paragraph 1 be made to compensate Mr. Forste for retirement claims.

Respondent points out that DHS issued Forms W-2 for 1996 and for prior years, in which it consistently reported the payments it made under the settlement agreement as taxable income to Mr.

Forste.  While this fact may be relevant in certain situations, we do not think that it should be given much weight in this case. Other than the Forms W-2 themselves, there is no evidence regarding why DHS reported the payments as taxable income. Petitioners claim that Mr. Forste simply allowed the withholding to continue without objection because it satisfied part of his obligations to make estimated tax payments.  Petitioners' 1996 income tax return shows that even with the withholding by DHS, they owed over $5,000 in tax when the 1996 return was due.  Given the fact that the Internal Revenue Service (IRS) had examined petitioners' returns for prior years on three separate occasions and agreed that the DHS payments were excludable, it would appear that petitioners could have notified DHS of the results of those examinations and requested that withholding be discontinued. Indeed, the IRS had advised Mr. Forste to attach documentation of the prior examinations to his future returns to show that the amounts received from DHS were excludable.

Obviously the evidence presents us with a difficult task. This no doubt accounts for the parties' extensive arguments over who has the burden of proof in light of section 7491.  Although this case is very close, we find that petitioners have presented credible evidence; i.e., sufficient evidence upon which to base a decision that the payment of $25,130 pursuant to paragraph 1 of the settlement agreement was made in settlement of Mr. Forste's

tort or tort type claims for personal injury.  Pursuant to the definition of credible evidence contained in the legislative history of section 7491(a)(1), our finding that petitioners have presented credible evidence is made before considering any contrary evidence submitted by respondent.  We therefore hold that pursuant to section 7491, the burden of proof on whether $25,130 from DHS was received on account of a tort or tort type claim for personal injury shifted to respondent.

IV.  Respondent Failed To Meet Burden of Proof

After petitioners presented their case, respondent called only one witness, Mr. Ladd.  Mr. Ladd negotiated the Forste settlement on behalf of DHS.  Mr. Ladd was in charge of human resources for DHS and was its national personnel partner.  He was in charge of the retirement and severance pay issues that resulted from DHS's decision to terminate the employment of partners and directors in 1985.  On the other hand, Mr. Forste's situation involving tort and tort type personal injury claims was unique to Mr. Forste.  Nevertheless, Mr. Ladd had almost no recollection of the reasons for the critical language in the various proposed drafts and the final settlement document in Mr. Forste's case.  Mr. Ladd's failure to recall the circumstances and whether DHS intended to compensate Mr. Forste for personal injury claims might raise an inference that DHS's reason for entering into the agreement was no different than DHS's reasons

for paying retirement or severance benefits to the other partners and directors who were being terminated.  Such an inference could detract from the weight of petitioners' evidence and would have to be considered in deciding whether petitioners met their burden if the burden of proof remained on petitioners.  However, if the burden of proof has shifted to respondent, as we hold that it has, Mr. Ladd's testimony clearly fails to satisfy respondent's burden of proving that the $25,130 payment from DHS was not intended to settle Mr. Forste's tort or tort type personal injury claims.  We hold that respondent has failed to meet his burden of proof with respect to this amount.

V.   Burden of Proof--Amount in Excess of $25,130

     We now decide whether any amount in excess of $25,130 is excludable.  Paragraph 2 of the settlement agreement provides for "additional compensation for other claims and entitlements".  There is nothing in the language of paragraph 2 or the negotiations leading up to the final agreement that would allow us to make an allocation of any amount paid under paragraph 2 to compensation for tort type personal injuries.[24]  Indeed, on brief, petitioners acknowledge that "This paragraph was intended to provide compensation for claims other than tort or tort-type claims."  Any increase to the annual payment of $25,130 specified

---

[24]In one of its draft proposals DHS began paragraph 2 as follows:  "In addition, as compensation for other non-tort claims and entitlements, DH&S agrees to provide me with:".

in paragraph 1 is made in paragraph 2 of the settlement agreement, and it is undisputed that paragraph 2 was intended to compensate for nontort type injuries. Petitioners suggest that the parenthetical reference in paragraph 1 to adjustments required by paragraph 2.e. demonstrates that the adjustments required by paragraph 2.e. were also intended to compensate for tort type claims. We do not interpret the settlement agreement that way. All the 1996 payments in excess of $25,130 were apparently paid pursuant to the specific provisions of paragraph 2.e. The settlement agreement and other evidence petitioners submitted would not be sufficient for us to decide that any amount of the DHS payments in excess of $25,130 was paid on account of a tort or tort type personal injury. Thus, the burden of proof remains on petitioners as to the payments in excess of $25,130, and petitioners have failed to meet their burden of proof.

VI.  Equitable Estoppel

Petitioners argue that irrespective of the burden of proof, respondent should be equitably estopped from arguing that any of the payments at issue are not excludable from gross income under section 104(a)(2).

"[T]he doctrine of equitable estoppel is applied against the Government 'with the utmost caution and restraint'", Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981) (citing Estate of

Emerson v. Commissioner, 67 T.C. 612, 617 (1977)), affd. 810 F.2d 209 (D.C. Cir. 1987), and it applies only if: (1) There is a false representation or wrongful misleading silence; (2) the error is in a statement of fact and not in an opinion or a statement of law; (3) the person claiming the benefits of estoppel is ignorant of the true facts; and (4) the person claiming the benefits of estoppel is adversely affected by the acts or statements of the person against whom an estoppel is claimed, Estate of Emerson v. Commissioner, supra at 617-618; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645, affd. without published opinion 159 F.3d 1346 (2d Cir. 1998).

In the Ninth Circuit, in which this case is appealable, "the aggrieved party must also demonstrate 'affirmative conduct going beyond mere negligence' and "that the government's act will cause a serious injustice and the imposition of estoppel will not unduly harm the public interest". Purcell v. United States, 1 F.3d 932, 939 (9th Cir. 1993) (quoting S & M Inv. Co. v. Tahoe Regl. Planning Agency, 911 F.2d 324, 329 (9th Cir. 1990)). "Affirmative misconduct involves '"ongoing active misrepresentations" or a "pervasive pattern of false promises"' as opposed to 'an isolated act of providing misinformation.'" Id. at 940 (quoting S & M Inv. Co. v. Tahoe Regl. Planning Agency, supra at 329 (quoting Watkins v. United States Army, 875 F.2d 699, 708 (9th Cir. 1990))).

Petitioners cite respondent's repeated audits on the same issue in 1990, 1992, and 1993, respondent's concessions in those audits, and the tax auditor's letter advising petitioners to attach the stipulated Tax Court decision to their future returns as evidence of affirmative misconduct.[25]  However, respondent's prior audits and concessions alone do not constitute affirmative misconduct, see Frische v. Commissioner, T.C. Memo. 2000-237, and while petitioners may have relied on the tax auditor's letter, that representation does not rise to the level of affirmative misconduct.  Petitioners point to no other instances of alleged misconduct on the part of respondent that would justify application of the doctrine of equitable estoppel, and we find nothing in the record which demonstrates respondent engaged in any affirmative misconduct.

There is no serious injustice in requiring petitioners to include in gross income amounts which are not properly excluded under section 104(a)(2) with respect to a taxable year that was not previously at issue and which was not the subject of any representations by respondent.  The evidence that petitioners

---

[25]Petitioners rely on certain language contained in Willamette Valley Lumber Co. v. United States, 252 F. Supp. 199, 205 (D. Or. 1966), and argue that "where the Commissioner repeatedly audits a taxpayer's returns for several years and repeatedly accepts how a certain transaction has been reported, it may be estopped from arguing to the contrary in a subsequent year."  We are not bound by the District Court opinion, and we decline to adopt petitioners' argument as the law to be applied in this case.

presented in support of their equitable estoppel argument not only fails to show affirmative misconduct on the part of respondent; it fails to preclude the possibility that respondent's concessions in the prior taxable years were attributable to mistakes of law.  The doctrine of equitable estoppel does not bar respondent from correcting mistakes of law. Auto. Club of Mich. v. Commissioner, 353 U.S. 180, 183 (1957); Zuanich v. Commissioner, 77 T.C. 428, 432-433 (1981).  We hold that equitable estoppel does not apply to respondent's determinations in this case.

VII.  Conclusion

We hold that $25,130 of the payments Mr. Forste received from DHS in 1996 is excludable from petitioners' gross income under section 104(a)(2).  We also hold that the payments Mr. Forste received from DHS in 1996 that exceed $25,130 are not excludable from gross income under section 104(a)(2).

Decision will be

entered under Rule 155.