# United States Tax Court

T.C. Memo. 2024-42

ESTATE OF ROMAN J. FINNEGAN, DECEASED, KEVIN C.
TANKERSLEY, PERSONAL REPRESENTATIVE, AND LYNNETTE
FINNEGAN, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 26869-21, 26872-21,                     Filed April 10, 2024.
          26874-21, 26877-21.

————

*Alan J. Irvin* and *Peter H. Donahoe*, for petitioners.

*Timothy A. Lohrstorfer*, *Andrew Yamanaka Belter*, *Nathan M. Swingley*,
and *William M. Rowe*, for respondent in Docket Nos. 26869-21 and
26872-21.

*Timothy A. Lohrstorfer*, *Andrew Yamanaka Belter*, and *Nathan M.
Swingley*, for respondent in Docket Nos. 26874-21 and 26877-21.

## MEMORANDUM FINDINGS OF FACT AND OPINION

NEGA, *Judge*: These consolidated cases concern Notices of
Deficiency issued to petitioners in 2021 for tax year 2017. The issue for
decision is whether settlement proceeds petitioners received should be

---

[1] Cases of the following petitioners are consolidated herewith: Christopher J.
Ramsbey and Katelynn G. Ramsbey, Docket No. 26872-21; Johnathon P. Abair and
Tiffany D. Abair, Docket No. 26874-21; and James R. Riffey and Tabitha Riffey, Docket
No. 26877-21.

**[\*2]** excluded from their gross incomes under section 104(a)(2),[2] which shields damages received "on account of personal physical injuries or physical sickness." We hold for respondent.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated in our findings by this reference.

I.    *Background*

Roman J. Finnegan (Roman) was a resident of Indiana when he died. Kevin C. Tankersley, the personal representative of Roman's estate, and Lynnette Finnegan (Lynnette) resided in Indiana when they filed the Petition in this matter.

Petitioners Christopher J. Ramsbey and Katelynn G. Ramsbey (Katelynn) resided in Tennessee when they filed the Petition in their case.

Petitioners Johnathon P. Abair (Johnathon) and Tiffany D. Abair resided in Indiana when they filed the Petition in their case.

Petitioners James R. Riffey and Tabitha Riffey (Tabitha) resided in Indiana when they filed the Petition in their case.

Lynnette is the mother of Katelynn, Johnathon, and Tabitha.

Roman was the stepfather of Katelynn, Johnathon, and Tabitha.

Roman and Lynnette married in May 2004.

On December 20, 2005, a sixth member of the family, J.S.,[3] daughter of Lynnette, died at the age of 14.

---

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Because J.S. was a minor child when she died, her name has been redacted in accordance with Rule 27(a)(3).

**[*3]**    At the time of her death, J.S. suffered from several medical issues and lived with Roman, Lynnette, and her three siblings, Katelynn, Johnathon, and Tabitha.

After J.S.'s death, the Pulaski County Department of Child Services, Indiana Department of Child Services (DCS), and Indiana State Police (ISP) accused Roman and Lynnette of neglect and abuse of J.S. and opened investigations into J.S.'s cause of death.

As a result of the investigations, ISP arrested Roman and Lynnette for medical neglect relating to the death of J.S.

The criminal charges filed against Roman and Lynnette were later dismissed with prejudice, and neither Roman nor Lynnette was convicted for any criminal wrongdoing relating to J.S.'s death.

Nine months after J.S.'s death, DCS removed Tabitha and Katelynn from the marital home of Roman and Lynnette and placed both girls into foster care. Tabitha and Katelynn were eventually returned home, but DCS continued with its investigation.

Pursuant to Ind. Code § 31-39-8-4 (2005), Roman and Lynnette requested the Pulaski Circuit Court to invalidate the following substantiations by DCS against them: (1) a December 5, 2005, substantiation of medical neglect for J.S. based on the postponement of a cardiology checkup; (2) a March 23, 2007, substantiation that J.S.'s death was caused by physical abuse; and (3) a March 23, 2007, substantiation that Johnathon, Tabitha, and Katelynn were in a life/health endangering environment.

After a hearing on the evidence, on January 28, 2010, the Pulaski Circuit Court ordered DCS to immediately unsubstantiate the December 5, 2005, and March 23, 2007, substantiations and to remove Roman and Lynnette from Indiana's child protection index.

Roman, Lynnette, Tabitha, and Katelynn (collectively, with Johnathon, plaintiffs) sued various individuals employed by the State of Indiana for their actions occurring after J.S.'s death by filing a complaint in the U.S. District Court, Northern District of Indiana, on October 29, 2008.

Petitioners Christopher J. Ramsbey, Tiffany D. Abair, and James R. Riffey were not plaintiffs in the district court case.

**[\*4]** II.  *Plaintiffs' Original Complaint*

Plaintiffs (excepting Johnathon, who was later added to the litigation by a First Amended Complaint) sued the following defendants, all of whom were employees of the State of Indiana: (1) Laurel Myers, Director of Pulaski County DCS (Myers); (2) Regina McAninch, investigator and case worker for Pulaski County DCS (McAninch); (3) Tracy Salyers, caseworker for Pulaski County DCS; (4) Reba James, Regional Manager for Indiana DCS (James); (5) James Payne, Director of Indiana DCS (Payne); (6) Jennifer McDonald, ISP detective (McDonald); (7) Antoinette Laskey, a pediatrician employed by the Indiana University School of Medicine, Methodist Hospital (Laskey); and (8) John Does 1–20 (collectively, defendants).

Paragraph 1 of the complaint states that plaintiffs brought the action under 42 U.S.C. § 1983 to seek redress for the violation of their civil rights under state law, federal law, and the First, Fourth, Sixth, and Fourteenth Amendments to the U.S. Constitution.

In paragraph 13, plaintiffs alleged that defendants acted individually and jointly under color of state law to deprive plaintiffs of their civil rights.

Plaintiffs alleged facts supporting their position that defendants had violated their civil rights.  Plaintiffs did not allege as a fact that any plaintiffs had developed post-traumatic stress disorder (PTSD) or that any plaintiff had developed or incurred a physical injury or sickness as a result of any defendant's actions.

In Count 1, plaintiffs alleged that defendants violated their First Amendment right to petition the government for redress of grievances by retaliating against the Finnegan family because Roman wrote a letter to a legislator in which he raised complaints concerning McAninch's behavior.

Further, plaintiffs alleged that, because of Roman's letter, McAninch, Myers, and Payne retaliated against the Finnegan family by creating a false substantiation of medical neglect, followed by a retaliatory investigation, illegal detention of the children, and findings of abuse and neglect that were not supported by evidence.

Count 2 alleged that the seizure of Tabitha and Katelynn by defendants McAninch and Myers (and which plaintiffs claimed was supported by Laskey and Payne) had no objectively reasonable basis and

**[\*5]** therefore violated the Finnegan family's Fourth Amendment right to be free from unreasonable seizure.

Plaintiffs also claimed a violation of their Fourth Amendment right to be free from unreasonable seizure relating to the exhumation of J.S.'s body and search of the Finnegan family home. Plaintiffs further claimed a violation of their Fourth Amendment rights relating to the arrest of Roman and Lynnette.

In Count 3, plaintiffs claimed defendants' actions violated their Sixth Amendment right to effective assistance of counsel.

In Count 4, plaintiffs alleged that defendants' actions violated their Fourteenth Amendment right to procedural and substantive due process.

Plaintiffs specifically alleged that their Fourteenth Amendment right to procedural and substantive due process was violated by defendants by (1) failure to produce any witnesses or evidence to support the claim that J.S. died due to physical abuse; (2) failure to provide exculpatory evidence or evidence subpoenaed by plaintiffs, omission of exculpatory information and inclusion of false information in reports, and action without reasonable or probable cause with deliberate indifference to plaintiffs' rights; and (3) deprivation of plaintiffs' equal protection and due process rights through refusal to comply with the applicable state and federal Child In Need of Services (CHINS) laws and regulations; violation of Indiana's Coroner's Code, Ind. Code § 36-2-14, which places responsibility for determining the cause and manner of death on the Coroner; and failure to provide appropriate accommodations to Lynnette.

Count 5 alleged that all defendants engaged in a conspiracy under 42 U.S.C. § 1983, which encompassed violations of state and federal CHINS laws, basic constitutional requirements, the Coroner's Code, and the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213.

Plaintiffs did not assert a claim that any plaintiff developed PTSD as a result of any action by any defendant. Likewise, plaintiffs did not assert in their request for relief a claim related to personal physical injury or physical sickness caused by any defendant.

**[\*6]** III.    *Interrogatories*

A.    *Roman*

As a part of the district court litigation, Roman answered defendants' first set of interrogatories.

Interrogatory 1 asked Roman to "[d]escribe in detail each and every item of damage, including medical expenses, which you contend resulted from [d]efendants' conduct as set forth in your complaint."

Roman's answer consisted of 53 separate paragraphs of narrative statements. Paragraph 41 contains the sole mention of PTSD.

In paragraph 41 of Roman's response to Interrogatory 1, Roman answered as follows: "When I first went back to work, there were days that I could not get out of bed.  I had attacks in which I couldn't breathe. I thought they were heart attacks but they were diagnosed as post-traumatic stress syndrome."

On June 14, 2010, Roman signed the first set of interrogatories under penalty of perjury and attested that the factual statements set forth in his responses were true and correct.

B.    *Lynnette*

As part of the district court litigation, Lynnette answered defendants' first set of interrogatories.

Interrogatory 1 asked Lynnette to "describe in detail each and every item of damage, including medical expenses, which you contend resulted from [d]efendants['] conduct as set forth in your complaint."

Lynnette's answer to Interrogatory 1 consisted of 38 separate narrative statements.

Lynnette's answer to Interrogatory 1 did not assert that defendants' conduct resulted in her receiving a diagnosis of or suffering from PTSD.

Lynnette's answer to Interrogatory 1 did not assert any damages stemming from physical injury or physical sickness resulting from defendants' conduct.

**[\*7]** On June 14, 2010, Lynnette signed the first set of interrogatories under penalty of perjury and attested that the factual statements set forth in her responses were true and correct.

C. *Katelynn*

As part of the district court litigation, Katelynn answered defendants' first set of interrogatories.

Interrogatory 1 asked Katelynn to "[d]escribe in detail each and every item of damage, including medical expenses, which you contend resulted from [d]efendants['] conduct as set forth in your complaint."

Katelynn's answer to Interrogatory 1 consisted of four separate, unnumbered paragraphs of narrative statements.

Katelynn's answer to Interrogatory 1 did not assert that defendants' conduct resulted in her receiving a diagnosis of or suffering from PTSD.

Katelynn's answer to Interrogatory 1 did not assert any damages stemming from physical injury or physical sickness resulting from defendants' conduct.

On June 14, 2010, Katelynn signed the first set of interrogatories under penalty of perjury and attested that the factual statements set forth in her responses were true and correct.

D. *Tabitha*

As part of the district court litigation, Tabitha answered defendants' first set of interrogatories.

Interrogatory 1 asked Tabitha to "describe in detail each and every item of damage, including medical expenses, which you contend resulted from [d]efendants['] conduct as set forth in your complaint."

Tabitha's answer to Interrogatory 1 consisted of 21 separate paragraphs of narrative statements.

Tabitha's answer to Interrogatory 1 did not assert that defendants' conduct resulted in her receiving a diagnosis of or suffering from PTSD.

**[*8]**   Tabitha's answer to Interrogatory 1 did not assert any damages stemming from physical injury or physical sickness resulting from defendants' conduct.

On June 15, 2010, Tabitha signed the first set of interrogatories under penalty of perjury and attested that the factual statements set forth in her responses were true and correct.

IV.   *Depositions*

A.   *Roman*

On July 30, 2010, Roman was deposed in the district court case.

During the deposition on July 30, 2010, the attorney and Roman had the following exchange of questions and answers:

Q. Are you claiming any physical injuries as a result of the—or illnesses as a result of any actions of the DCS or the state police?

A. I was diagnosed with post-traumatic stress.

Q. Who gave you that diagnosis?

A. Dr. James [Kenny] from Rensselaer.

Q. Are you getting any treatment for that?

A. No.

Q. How did you end up seeing Dr. [Kenny]?

A. I was having some problems at work.

Q. What kind of problems?

A. As he described it, it was like anxiety attacks.

Q. Are you taking any medication for that?

A. No.

During his deposition, concerning his treatment for PTSD, Roman answered the following:

[*9]  Q. Has Dr. [Kenny] recommended any treatment?

A. Well, I've seen Dr. [Kenny] for a while, and he was recommending different things. But being on the critical incident stress management team, the recommendations he gave me are the recommendations I would give somebody else, so I just kind of manage myself.

Also during his deposition, Roman provided the following clarification:

Q. And did Dr. [Kenny] specifically use the words post-traumatic—

A. Yes.

Q. —stress disorder?

A. Yes.

Q. Has any other doctor told you that?

A. No.

B.  *Other Plaintiffs*

Lynnette, Katelynn, Johnathon, and Tabitha were also deposed as part of the district court proceedings.

During their depositions, Lynnette, Katelynn, Johnathon, and Tabitha did not testify that they had PTSD diagnoses.

During their depositions, Katelynn, Johnathon, and Tabitha did not identify any personal physical injuries or physical sicknesses incurred as a result of defendants' actions.

During her deposition, when asked about any physical illnesses or injuries connected to the district court case, Lynnette answered that stress was exacerbating a pre-existing seizure disorder.

V.  *First Amended Complaint*

On May 13, 2012, plaintiffs filed a first amended complaint, which added Johnathon as a plaintiff and added three new defendants: Sheryl Pherson (Pherson); Michael Boonstra (Boonstra); and John Cavanaugh

**[*10]** (Cavanaugh) (collectively, additional defendants, and, from May 13, 2012, forward, collectively with the seven original defendants, defendants).

In the first amended complaint, plaintiffs realleged their legal claims of Counts 1 through 5 from the original complaint. The first amended complaint also added new causes of action, listed as Counts 6 through 11, related to the additional defendants.

Count 6 alleged that Pherson and Boonstra violated plaintiffs' Fourth Amendment right to freedom from unreasonable search and seizure.

Count 7 alleged that Pherson and Boonstra violated plaintiffs' Sixth Amendment right to effective assistance of counsel.

Count 8 alleged that Pherson and Boontra's actions violated plaintiffs' Fourteenth Amendment right to procedural and substantive due process.

Count 9 alleged that Cavanaugh violated plaintiffs' Fourteenth Amendment right to procedural and substantive due process.

Count 10 alleged that the additional defendants participated in a conspiracy to violate plaintiffs' civil rights.

Count 11 alleged that defendants' actions violated Johnathon's First Amendment right to petition the government, Fourth Amendment right to freedom from unreasonable search and seizure, and Fourteenth Amendment right to procedural and substantive due process and constituted a broad-based conspiracy to violate his civil rights.

In the first amended complaint, plaintiffs did not assert a claim that any plaintiff developed PTSD as a result of any action by any defendant. Likewise, plaintiffs did not assert in their request for relief a claim related to personal physical injury or physical sickness caused by any defendant.

VI. *Defendants' Motion to Dismiss First Amended Complaint and Plaintiffs' Response Thereto*

On September 6, 2012, defendants filed a Motion to Dismiss First Amended Complaint (defendants' motion to dismiss) in the district court.

**[\*11]** On October 4, 2012, plaintiffs responded to defendants' motion to dismiss (plaintiffs' response).

In their response, plaintiffs provided a summary of facts. In this summary of facts, plaintiffs did not allege that any plaintiff developed PTSD due to any defendant's actions or that any defendant caused any plaintiff physical injury or physical sickness.

In plaintiffs' legal discussion in support of plaintiffs' response, plaintiffs did not allege that any plaintiff developed PTSD resulting from any defendant's actions or that any defendant's actions caused any plaintiff physical injury or physical sickness.

Plaintiffs' response withdrew plaintiffs' claim that defendants violated plaintiffs' Sixth Amendment right to counsel.

Attached to plaintiffs' response were a number of exhibits: (1) a Pulaski Circuit Court order dated January 28, 2010; (2) three notices of emergency detention (one each corresponding to Tabitha, Johnathon, and Katelynn), signed by McAninch and issued to Lynnette; (3) a Pulaski Circuit Court chronological case summary; and (4) documents from a proceeding before Jasper Superior Court. None of the attached documents established that any plaintiff suffered from PTSD or that any defendant caused any plaintiff physical injury or physical sickness.

VII.  *Defendants' Motion to Strike*

On October 22, 2012, defendants filed State Defendants' Motion to Strike (defendants' motion to strike) in the district court litigation. In defendants' motion to strike, defendants requested that the district court strike from plaintiffs' response all information not contained in the complaint.

By opinion and order, issued June 5, 2013, the district court addressed defendants' motion to dismiss and defendants' motion to strike.

The district court granted defendants' motion to dismiss as to Katelynn's, Johnathon's, and Tabitha's First Amendment violation claims in Count 1, Count 3 (Sixth Amendment), and Count 4 (equal protection and ADA claims); denied defendants' motion to dismiss as to the remaining claims; and denied defendants' motion to strike.

**[\*12]** The district court addressed the factual assertions at issue in defendants' motion to strike (none of which assert that any plaintiff suffered from PTSD nor any defendant's actions caused physical injury or physical sickness) and found them to be consistent with the first amended complaint and merely illustrative for the court.

VIII.   *Agreed Jury Instructions*

On August 17, 2015, the parties filed agreed jury instructions in the district court litigation, consisting of 31 instructions. Instruction 27 stated, in pertinent part, that "the issue is whether the [d]efendant or [d]efendants violated the [p]laintiffs' civil rights." The agreed jury instructions did not include an instruction addressing PTSD of any plaintiff or an instruction addressing physical injury or physical sickness of any plaintiff caused by any defendant's actions.

IX.   *Voir Dire Questions*

On August 17, 2015, the parties filed agreed proposed voir dire questions. Subsequently, also on August 17, 2015, the parties filed a corrected version of the questions.

Question 21 of the corrected version stated, in part: "This case is about alleged violations of civil rights and appropriate compensation." Question 21 further stated that plaintiffs were seeking compensation from defendants "for alleged violations of the Plaintiffs' civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution." Question 21, subparagraph a, posed the following question: "Do you have an opinion as to whether citizens should be able to recover compensation in a lawsuit for damages they have suffered when their constitutional rights are violated?"

Question 22 of the corrected version stated: "At the conclusion of this lawsuit, you may be asked to award compensation for mental and emotional suffering. Although there is no obvious way to put a dollar amount on mental suffering, if selected as a juror would you be able and willing to do this if the evidence and the law supported it?"

The corrected version included no questions addressing PTSD and no questions addressing physical injury or physical sickness.

Also on August 17, 2015, plaintiffs filed plaintiffs' proposed voir dire questions in the district court litigation, setting forth five additional questions to which defendants had not agreed.

[*13] Question 1 of plaintiffs' proposed voir dire questions asked: "Do you have an opinion as to whether individual citizens should be protected from unreasonable searches and seizures as required by the Fourth Amendment?"

Question 2 of plaintiffs' proposed voir dire questions asked: "Do you have an opinion as to whether individual citizens should be protected from arrest without probable cause as also required by the Fourth Amendment?"

Question 3 of plaintiffs' proposed voir dire questions asked: "Do you have an opinion as to whether due process, as required by the Fourteenth Amendment, should be followed before government employees take[] certain actions like seizing children or arresting parents?"

Question 4 of plaintiffs' proposed voir dire questions asked: "Do you have an opinion as to whether a citizen should be able to exercise his First Amendment rights to free speech and to petition the government by writing a letter complaining about conduct of a state agency without being subjected to retaliation by employees of the state agency?"

Plaintiffs' proposed voir dire questions did not include an instruction addressing PTSD or physical injury or physical sickness of any of the plaintiffs caused by any defendant's actions.

X.      *Plaintiffs' Proposed Preliminary Statement*

On August 31, 2015, plaintiffs filed plaintiffs' proposed preliminary statement in the district court litigation. Plaintiffs' proposed preliminary statement contends that defendants violated plaintiffs' civil rights protected by the First, Fourth, and Fourteenth Amendments.

XI.     *District Court Trial*

The district court trial occurred from September 16 through October 6, 2015.

At the start of the trial and before the parties' respective opening statements, the district court judge summarized to the jury the issues presented in the case. In this introduction, the district court judge summarized the district court case as follows:

[*14] Plaintiffs' Complaint alleges that, following [J.S.]'s death [d]efendants engaged in conduct which violated their civil rights protected by the United States Constitution. Specifically, [p]laintiffs allege that the [d]efendants acted unreasonably, recklessly, and knowingly, in violation of [p]laintiffs' 1st Amendment right to petition the government, their 4th Amendment right to freedom from unreasonable search and seizure, and their 14th Amendment right to substantive and procedural due process.

The district court judge further summarized:

The [d]efendants deny that they violated the civil rights of the [p]laintiffs and further contend that they did not act recklessly or knowingly to violate the [p]laintiffs' civil rights. Rather, [d]efendants contend that they acted reasonably under the circumstances. Defendants deny liability for any claims asserted by any of the [p]laintiffs.

Counsel for plaintiffs, Ronald J. Waicukauski, gave an opening statement as part of the district court trial.

Describing plaintiffs' claims, Mr. Waicukauski stated the following:

[W]e've asserted civil rights claims. We've asserted civil rights claims under the First Amendment . . . .

We've asserted claims here under the Fourth Amendment that says searches have to be reasonable, they have to be based on evidence and fact. And the searches that were conducted here and the seizures that were conducted here, the seizure of the arrest, the false arrest, the seizure of the detention of the girls that extended for nine months, the detention even on the day of the event, the exhumation of [J.S.]'s body, they all violated the Fourth Amendment's prohibition against unreasonable searches and seizures.

Mr. Waicukauski further stated:

Maybe most important[] is the claim under the Fourteenth Amendment. That's the claim that says every

**[\*15]** parent and every child has a fundamental interest in the companions and society of the other in these familial relationships, and they cannot be separated by government, other than in emergent situations or to protect the child against imminent danger.

> This substantive due process, the evidence will show, establishes that is violated by the seizing of Tabitha and Katelynn without probable cause to believe that they were in any danger, detaining them for nine months for purposes of investigative therapy, for providing false reports and concealing exculpatory evidence in order to continue this detention, to tell Johnathon and his sisters that their mother had murdered their sister and to tell Johnathon in particular that his mother was accusing him of killing his sister, and thereby deliberately and systematically destroying family ties and relationships.

In his opening statement, Mr. Waicukauski did not describe any of the plaintiffs as having developed PTSD as a result of any defendant's action, nor did he describe any of the plaintiffs as having incurred a physical injury or physical sickness as a result of any defendant's actions.

A.   *Trial Testimony*

Roman testified during the district court trial.

In support of plaintiffs' First Amendment claims under Count 1 of the original and first amended complaints, Roman testified regarding his interactions with DCS, which had led him to send a letter of complaint to his state legislator before J.S.'s death and the ISP investigation.

In support of plaintiffs' Fourth Amendment claims under Count 2 of the original and first amended complaints, Roman testified concerning the removal of Tabitha and Katelynn after DCS's investigation into J.S.'s death.

In support of plaintiffs' claims of violation of their Fourteenth Amendment rights, Roman testified regarding his efforts to obtain exculpatory evidence to explain J.S.'s death by prescription error and the State of Indiana's refusal to consider the evidence.

**[\*16]** In support of Roman and Lynnette's Fourth Amendment violation claim resulting from their false arrest, Roman testified regarding his and Lynnette's arrests related to their alleged medical neglect of J.S.

In support of plaintiffs' Fourth Amendment violation claim resulting from the continued detention of Tabitha and Katelynn, Roman provided testimony on Tabitha's and Katelynn's removal from the marital home.

During the four-week trial, Roman testified that Dr. James A. Kenny treated him for PTSD as follows:

> Q. When you sought counseling from Dr. Kenny, did he treat you for any specific condition?
>
> A. The condition he called is post traumatic stress. It's typical. It's the same diagnosis as people in the military are getting. It's kind of currently in the news. But that was the—that was his diagnosis.

This singular reference constitutes the entirety of Roman's testimony before the district court regarding any PTSD diagnosis.

Numerous witnesses testified on plaintiffs' behalf during the district court case, including: (1) Dr. James A. Kenny, Ph.D.; (2) Dr. Randall Krupsaw, clinical psychologist; (3) Lynnette; (4) Johnathon; (5) Tabitha; (6) Katelynn; (7) Tim Brown; (8) John Majchrzak; (9) Gloria Jean Majchrzak; (10) Pam Graham Liston; (11) David Geisler; (12) Bonnie Schmidt; (13) Tom Rausch; and (14) Dr. Gordon Klockhow.

Dr. Krupsaw reviewed counseling and case notes with respect to Tabitha's and Katelynn's removal from the marital home and placement in foster care. From his review of these documents, Dr. Krupsaw opined that DCS's actions could "lead to something as severe as post-traumatic stress disorder type of symptoms in one or both girls." Dr. Krupsaw was not Tabitha's or Katelynn's treating psychologist.

Dr. Kenny testified that he "treated Roman for anxiety disorder and post-traumatic stress disorder in 2007 and '08." None of the other 14 aforementioned witnesses, including Dr. Krupsaw, identified any plaintiff as suffering or having suffered from PTSD, nor did any witness describe any personal physical injury or physical sickness of any plaintiff resulting from any defendant's actions.

**[\*17]**  B.     *Defendants' Motion for Judgment as a Matter of Law*

At the conclusion of plaintiffs' case in chief in the district court trial, defendants orally made a motion for Judgment as a Matter of Law (JMOL motion) pursuant to Rule 50 of the Federal Rules of Civil Procedure.

In addressing the JMOL motion, defendants (excluding Laskey) stated that plaintiffs had "brought multiple claims," then addressed each in turn.

Defendants first addressed plaintiffs' First Amendment claim and provided argument as to why defendants believed that they were entitled to judgment as a matter of law.

Defendants next addressed plaintiffs' substantive due process claim "regarding the Fourteenth Amendment regarding familial relations."   Defendants contended that Katelynn, Tabitha, and Johnathon did not have a Fourteenth Amendment claim but rather a Fourth Amendment claim and that defendants were therefore entitled to judgment as a matter of law.  Defendants asserted that Roman and Lynnette's claims under the Fourteenth Amendment were likewise legally insufficient.

Defendants then argued that plaintiffs' procedural due process claim failed because plaintiffs were afforded the process that was due to them.

Defendants next turned to plaintiffs' Fourth Amendment claims and contended that these claims too failed and that defendants were entitled to judgment as a matter of law because "many" of the searches were conducted pursuant to court orders.

Defendants then argued that plaintiffs failed to present sufficient evidence to support their conspiracy claim and that defendants were entitled to judgment as a matter of law.

Laskey joined the JMOL motion as to the Fourth and Fourteenth Amendment claims (i.e., the claims concerning rights that plaintiffs contended that Laskey violated).

Plaintiffs responded with their arguments as to why the JMOL motion should be denied.

**[\*18]** As part of their response, plaintiffs stated as follows: "But there is more than sufficient evidence here for a reasonable jury to rely upon, both direct and circumstantial, in order to determine that these [d]efendants knowingly violated the [p]laintiffs' constitutional rights."

Plaintiffs argued that their Fourth Amendment claims were sufficiently supported by evidence.

Plaintiffs then argued that their Fourteenth Amendment substantive due process claim was also sufficiently supported by evidence.

Plaintiffs next argued that "plenty of evidence" supported their claim that defendants were engaged in a conspiracy.

Finally, plaintiffs argued that "plenty of evidence" also supported their First Amendment claim.

The district court took the JMOL motion under advisement.

C.    *Closing Arguments*

In the district court case, both plaintiffs and defendants made closing arguments to the jury.  Beforehand, the district court reminded the jury that "what [the attorneys] say is not evidence, and you will disregard what they say unless supported by the evidence."

1.    *Plaintiffs' Closing Argument*

Mr. Waicukauski gave the closing argument on behalf of plaintiffs.

Mr. Waicukauski argued to the jury that it should hold defendants liable for the actions taken by defendant's after J.S.'s death when defendants

> falsely accused Roman and Lynnette Finnegan of killing [J.S.], when they took Tabitha and Katelynn and put them in foster care for nine months, when they exhumed [J.S.]'s body for a second autopsy, when they arrested and jailed Roman and Lynnette, and, when having failed on one charge, they brought another and another, and when the facts finally showed all their charges to be false, they

**[\*19]**  reaffirmed them, and, finally, after more than four years, a Judge ordered them to stop.

Mr. Waicukauski informed the jury that the verdict form would be 22 pages long and would address eight claims. Mr. Waicukauski explained that "[e]ach of these claims are ones we are asking you to consider in determining whether these [d]efendants will be held accountable for that course of conduct," before outlining each in turn.

Mr. Waicukauski described the first claim as arising "under the First Amendment, and, specifically, the right to petition the government."

Mr. Waicukauski described the next five claims as arising "under the Fourth Amendment, and, specifically, the prohibition of unreasonable searches and seizures."

Mr. Waicukauski described the final two claims as arising "under the Fourteenth Amendment, claims for both procedural due process and substantive due process."

Concerning plaintiffs' First Amendment claim, Mr. Waicukauski stated: "So you've got essentially the framework of the claim. So denial of free speech, that Roman sent the letter on behalf of himself and Lynnette, and the claim is [defendants] retaliated."

Mr. Waicukauski discussed plaintiffs' Fourth Amendment claim arising from the DCS pickup of Tabitha, Johnathon, and Katelynn on December 20, 2005, and characterized McAninch as having "detained them for several hours." Mr. Waicukauski went on to "contend that that detention is an unreasonable search."

Mr. Waicukauski then discussed plaintiffs' Fourth Amendment claim arising from the removal of Tabitha and Katelynn from the marital home on November 1, 2006, which he characterized as "a very significant seizure."

Mr. Waicukauski explained that a seizure is unreasonable (1) "when you withhold material information"; (2) "if you make false representations to the Court"; (3) if children are seized "for the purpose of an investigation"; or (4) if there is failure "to follow procedural rules" and "make reasonable efforts to keep the children in the home."

**[*20]** Mr. Waicukauski then explained plaintiffs' Fourth Amendment claim arising from the search of the marital home in January 2007, which he characterized as "an unreasonable search."

Mr. Waicukauski described plaintiffs' Fourth Amendment claim arising from the exhumation of J.S.'s body, also in January 2007, which he also explained as unreasonable.

Mr. Waicukauski next described plaintiffs' Fourth Amendment claim arising from the arrest of Roman and Lynnette on April 24, 2007, which he characterized as "a false arrest."

Mr. Waicukauski then described plaintiffs' Fourteenth Amendment procedural due process claims.

Mr. Waicukauski next discussed plaintiffs' Fourteenth Amendment substantive due process claim, stating: "Substantive due process protects familial relations. It says that the State and State employees, like we have here, are not allowed to unreasonably interfere with familial relations."

Mr. Waicukauski made the following statement concerning PTSD:

> As Dr. Krupsaw said, [Katelynn's] avoidance of even the ability to talk about it is consistent with post-traumatic stress disorder, which certainly she suffered, and as Dr. Kenny testified, Roman suffered when he lost his job and all of his possessions and his home and was charged with a crime of causing his stepdaughter's death.

However, Mr. Waicukauski's conclusion is supported neither by Dr. Krupsaw's testimony nor by the evidence in the district court case.

Mr. Waicukauski did not allege that the evidence supported a PTSD diagnosis for Lynnette, Tabitha, or Johnathon. Likewise, Mr. Waicukauski did not argue that any plaintiff had developed or incurred a physical injury or physical sickness as a result of any defendant's actions.

D. *Jury Instructions*

At the conclusion of closing arguments, the district court judge read the final instructions to the jury.

[*21] The district court instructed the jury:

> You have two duties as a jury. The first duty is to decide the facts from the evidence in this case. This is your job and yours alone. Your second duty is to apply the law that I give you to the facts.

The district court further instructed that "[t]he evidence consists of the testimony of witnesses, the exhibits admitted into evidence, and stipulations" and that "the lawyers' opening statements and closing statements to you are not evidence."

The district court instructed the jury on the law and on plaintiffs' claims that defendants violated plaintiffs' First, Fourth, and Fourteenth Amendment rights.

The district court then instructed the jury that, if it found for any plaintiff,

> [it] must determine what amount of money will fairly compensate for any injury that he or she may have sustained or is reasonably certain to sustain in the future as a direct result of the alleged violation of constitutional rights by a particular [d]efendant. These are called compensatory damages.

The district court then instructed the jury that it should consider the following types of compensatory damages and no others:

> One, physical or mental or emotional pain and suffering that [p]laintiff you are considering has experienced and is reasonably certain to experience in the future. No evidence of the dollar value or physical, mental, or emotional pain and suffering and loss of a normal life has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on the amount of pain and suffering. You are to determine an amount that will fairly compensate the [p]laintiff for the injury he or she has suffered.

The district court did not instruct the jury on any claims related to PTSD.

**[*22]** The district court did not instruct the jury on any claims related to physical injury or physical sickness.

On October 5, 2015, the case was submitted to the jury.

E.      *Jury Verdict*

On October 6, 2015, the district court jury reached a verdict.

The jury form asked the jury (1) whether the jury found in favor of plaintiffs (i.e., a particular plaintiff against a particular defendant sued by plaintiffs in their complaint) and (2), if the jury found for plaintiffs against a particular defendant for a particular claim, the amount of compensatory damages that the jury awarded to that claim.

The jury found in favor of Lynnette and Roman as to a violation of each's First Amendment right to petition the government against Myers.

The jury awarded Lynnette compensatory damages of $625,000 for her First Amendment claim.  The jury awarded Roman compensatory damages of $625,000 for his First Amendment claim.

The jury found in favor of plaintiffs as to a violation of each's Fourth Amendment right to freedom from unreasonable searches and seizures, specific to December 20, 2005, against Myers and McAninch.

The jury awarded Lynnette compensatory damages of $100,000 for her Fourth Amendment claim, specific to December 20, 2005.  The jury awarded Roman compensatory damages of $100,000 for his Fourth Amendment claim, specific to December 20, 2005.  The jury awarded Johnathon compensatory damages of $150,000 for his Fourth Amendment claim, specific to December 20, 2005.  The jury awarded Katelynn compensatory damages of $150,000 for her Fourth Amendment claim, specific to December 20, 2005.  The jury awarded Tabitha compensatory damages of $150,000 for her Fourth Amendment claim, specific to December 20, 2005.

The jury found in favor of Lynnette, Roman, Tabitha, and Katelynn as to a violation of each's Fourth Amendment right to freedom from unreasonable searches and seizures, specific to November 2006, against Myers and McAninch.

**[*23]** The jury awarded Lynnette compensatory damages of $1 million for her Fourth Amendment claim, specific to November 2006. The jury awarded Roman compensatory damages of $250,000 for his Fourth Amendment claim, specific to November 2006. The jury awarded Tabitha compensatory damages of $2 million for her Fourth Amendment claim, specific to November 2006. The jury awarded Katelynn compensatory damages of $2 million for her Fourth Amendment claim, specific to November 2006.

The jury did not find in favor of any plaintiff for their Fourth Amendment claims related to the (1) January 2007 search of the Finnegan marital home; (2) exhumation of J.S.'s body; and (3) April 24, 2007, arrest of Roman and Lynnette.

As to plaintiffs' Fourteenth Amendment procedural due process claims, the jury found in favor of Lynnette and Roman against Myers, McAninch, James, McDonald, and Laskey; in favor of Tabitha and Katelynn against Myers and McAninch; and in favor of Johnathon against Myers, McAninch, and McDonald.

The jury awarded Lynnette compensatory damages of $3 million for her Fourteenth Amendment procedural due process claim. The jury awarded Roman compensatory damages of $5 million for his Fourteenth Amendment procedural due process claim. The jury awarded Tabitha compensatory damages of $100,000 for her Fourteenth Amendment procedural due process claim. The jury awarded Katelynn compensatory damages of $50,000 for her Fourteenth Amendment procedural due process claim. The jury awarded Johnathon compensatory damages of $50,000 for his Fourteenth Amendment procedural due process claim.

As to plaintiffs' Fourteenth Amendment substantive due process claims, the jury found in favor of Lynnette, Roman, Tabitha, and Katelynn against Myers and in favor of Johnathon against Myers and McDonald.

The jury awarded Lynnette compensatory damages of $3 million for her Fourteenth Amendment substantive due process claim. The jury awarded Roman compensatory damages of $3 million for his Fourteenth Amendment substantive due process claim. The jury awarded Tabitha compensatory damages of $3 million for her Fourteenth Amendment substantive due process claim. The jury awarded Katelynn compensatory damages of $3 million for her Fourteenth Amendment

**[*24]** substantive due process claim. The jury awarded Johnathon compensatory damages of $4 million for his Fourteenth Amendment substantive due process claim.

In total, the jury awarded plaintiffs compensatory damages totaling $31.35 million.

The jury did not find in favor of any plaintiff on the issue of punitive damages.

The jury form used by the jury to award damages did not state that any damages were awarded to any plaintiff for (1) the development of PTSD due to any defendant's actions or (2) any personal physical injury or physical sickness to any petitioner as a result of any defendant's actions.

The district court entered judgment based on the jury verdict on October 9, 2015.

XII. *Defendants' Motion to Alter or Amend Judgment & Plaintiffs' Response Thereto*

On November 6, 2015, the State of Indiana, pursuant to Rule 59 of the Federal Rules of Civil Procedure, filed a motion to alter or amend judgment by reducing damages (defendants' motion to alter or amend).

Defendants filed a memorandum in support of defendants' motion to alter or amend. Therein, defendants argued that plaintiffs did not present any evidence to show an actual compensable loss. Specifically, defendants argued that, other than a "casual reference" to Roman's loss of salary, plaintiffs did not present any evidence of medical costs, lost income, or other compensatory or special damages. Rather, defendants contended that plaintiffs "relied entirely on a request for an award for emotional pain and suffering." Defendants also argued that, in addition to the damages not reflecting the evidence presented to the jury, the award was monstrously excessive and without a rational connection to the evidence.

On December 3, 2015, plaintiffs responded to defendants' motion to alter or amend. Plaintiffs noted that "juries are afforded substantial discretion in assessing damages, especially damages for intangible harms like those at issue here." Plaintiffs also argued that

[*25] [j]udicial deference is especially warranted in reviewing verdicts for non-economic intangible damages, such as for the deprivation of physical liberty and infliction of emotional harm where there is no set mathematical proof required, but which instead call for normative value judgments and evidentiary evaluations best left to the collective judgment of the jury.

Further, in response to defendants' argument that the jury's verdicts were not rationally connected to the evidence, plaintiffs provided the following summary:

Defendants simply ignore the evidence of the significant harm they inflicted upon the plaintiffs. Nowhere in their brief do they acknowledge the substantial trial evidence of the emotional harm they inflicted upon Roman and Lynnette Finnegan by falsely accusing them of causing their daughter's death and then illegally removing their surviving daughters from them. Defendants fail to mention the harm they inflicted upon Tabitha and Katelynn by falsely telling them their mother killed their sister, then separating them from their parents and forcing them to undergo nine months of investigative therapy, whereby they were forced to repeatedly relive their sister's death in an unethical, harmful and fruitless quest to uncover evidence of their parents' guilt. Defendants ignore the harm they caused by falsely telling Johnathon that his mother was blaming him for his sister's death, thereby alienating him from his family.

In their argument that the jury verdicts were rationally connected to the evidence, plaintiffs did not cite (1) PTSD as having been caused by defendants' actions or (2) any personal physical injury or physical sickness.

Plaintiffs then outlined the evidence that supported each of their constitutional claims for which the jury awarded compensatory damages.

Plaintiffs argued that the following evidence supported the jury's award of damages for their First Amendment claims: (1) Myers retaliated against Roman and Lynnette by the December 5, 2005, substantiation of the allegation that Roman and Lynnette medically

[*26] neglected J.S.; (2) this substantiation resulted in Roman and Lynnette's placement on Indiana's child abuse index for over four years; and (3) these actions damaged Roman and Lynnette's reputations and triggered subsequent further substantiations of abuse and neglect.

Plaintiffs argued that the following evidence supported the jury's award of damages for their Fourth Amendment claims, specific to December 20, 2005: (1) defendants' actions prevented the family from reuniting and mourning together on the date of J.S.'s death; (2) the surviving children were unlawfully held by DCS for five hours; and (3) DCS's action was a seizure that deprived the children of their liberty while being subjected to interrogations.

Plaintiffs argued that the following evidence supported the jury's award of damages for their Fourth Amendment claims, specific to November 2006: (1) defendants' removal of Tabitha and Katelynn was unlawful; (2) the emotional trauma inflicted by defendants' removal was compounded by McAninch's statement that Lynnette killed J.S.; and (3) defendants' removal emotionally traumatized Lynnette and Roman.

Plaintiffs argued that the following evidence supported the jury's award of damages for their Fourteenth Amendment procedural due process claim: (1) false accusations that Roman and Lynnette had caused J.S.'s death; (2) the falsification of the Child Fatality Review documents to state that the coroner had ruled J.S.'s death a homicide; (3) falsification of a forensic pathologist's 311 report; (4) refusal to permit Tabitha to testify at the detention hearings regarding feeling safe in the marital home, that Roman and Lynnette did not kill J.S., and her desire to return home; (5) false testimony that Tabitha and Katelynn were doing well and adjusting at their foster home; and (6) arbitrary substantiation of the false charges of neglect and abuse.

Plaintiffs argued that the following evidence supported the jury's award of damages for their Fourteenth Amendment substantive due process claims: (1) trauma from the family's separation and alienation from each other, including Roman's diagnosis of "Post-Traumatic Stress Disorder (PTSD) and Anxiety/Panic Disorder;" (2) Tabitha and Katelynn's deprivation of their physical liberty; (3) stress; and (4) McDonald's lie to Johnathan that Lynnette accused him of causing J.S.'s death.

**[\*27] XIII.** *District Court Opinion and Order*

On September 30, 2016, by opinion and order, the district court denied defendants' motion to alter or amend.

In summarizing the jury award, the district court stated:

> The Seventh Circuit has recognized that "[t]he required 'rational connection' between the evidence and the award does not imply mathematical exactitude, especially where the compensatory damages are for pain and suffering."

*Finnegan v. Myers*, No. 3:08-cv-503, slip op. at 5 (N.D. Ind. Sept. 30, 2016) (quoting *Hendrickson v. Cooper*, 589 F.3d 887, 892–93 (7th Cir. 2009)).

The district court further explained that "a verdict premised on 'nonpecuniary loss can be supported in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress.'" *Id.* (quoting *Deloughery v. City of Chicago*, 422 F.3d 611, 619–20 (7th Cir 2005)).

The district court noted that the jury repeatedly heard claims from multiple sources of the following: (1) Roman and Lynnette were falsely accused of causing J.S.'s death and had their surviving daughters removed from the family home during a time of grief; (2) Tabitha and Katelynn were told that their mother had killed J.S.; (3) Tabitha and Katelynn were separated from their parents and underwent months of "investigative" therapy; and (4) Johnathon was told, falsely, that his mother was blaming him for his sister's death.

The district court found "that it is more likely the jury believed the actions of [defendants] compounded that loss [(J.S.'s death)] and caused [p]laintiffs significant additional trauma at a time when they were most vulnerable and fragile." *Id.* at 8–9.

The district court additionally found "that it was rational for the jury to conclude that great emotional harm arose from [defendants'] actions that was separate and apart from the trauma of [J.S.'s] death and to award them in kind for those injuries." *Id.* at 9.

In the September 30, 2016, opinion and order upholding the jury award, the district court did not cite PTSD, personal physical injury, or physical sickness.

**[*28]** XIV.  *Settlement Agreement and Release and Settlement of Claim*

On October 28, 2016, defendants appealed the district court verdict to the U.S. Court of Appeals for the Seventh Circuit.

After the Seventh Circuit appeal, on April 4, 2017, the parties settled the district court litigation by executing a Settlement Agreement.

The preamble of the Settlement Agreement entered between plaintiffs and defendants states that the settlement was

> in full settlement and satisfaction of any and all of [p]laintiffs' claims against [defendants] for alleged violations of federal laws, civil rights, state law, constitutional rights, and any other claims arising from court proceedings in the United States District Court for the Northern District of Indiana and the United States Court of Appeals for the Seventh Circuit, and any connection thereto, up to and including the date of this Settlement Agreement.

Plaintiffs settled their claims against defendants for the sum of $25 million.

In the Settlement Agreement, plaintiffs agreed to execute a written document fully releasing defendants (and the State of Indiana, DCS, ISP, and their officers, agents, employees, and successors, known and unknown) from liability

> for any injuries or costs allegedly incurred by [p]laintiffs as a result of or related to any violation of [p]laintiffs' rights under state or federal law or under the United States Constitution by State Defendants which may exist or might be claimed to exist at or prior to the date of the Release, and any and all claims and causes of action of any nature whatsoever related to the court proceedings in the United States District Court for the Northern District of Indiana and the United States Court of Appeals for the Seventh Circuit which may exist or might be claimed to exist at or prior to the date of the Release.

Paragraph 5 of the Settlement Agreement stated as follows:

**[\*29]** Plaintiffs agree to hold [defendants] harmless from any and all actions, claims, and demands whatsoever which may now or hereafter exist on account of [defendants] not withholding taxes from any amounts paid in this agreement and to indemnify [defendants] and the State of Indiana from any and all loss, expense, penalty, or interest, including but not limited to, attorney's fees they may be required to pay or incur as a result of any action, claim or demand on account of [defendants] not withholding taxes provided that [defendants] complied with all applicable laws and regulations.

Paragraph 6 of the Settlement Agreement stated as follows:

Plaintiffs agree and understand that they are fully responsible for the reporting of income received under this Agreement, to the appropriate federal, state and local taxing authorities; that [p]laintiffs are responsible for paying taxes due on said income; and that the [defendants] and their representatives have made no promises or assurances, nor have they given any advice, regarding the tax treatment of said payments.

Also on April 4, 2017, plaintiffs signed a Release and Settlement of Claim.

The first paragraph of the Release and Settlement of Claim contained a release of liability of defendants. This release text stated that plaintiffs

do hereby release, acquit, and forever discharge the State of Indiana, [DCP], [ISP], [and defendants], and all their present and former agents, successors, and assigns, known and unknown, from any and all actions of any kind or nature whatsoever including lawsuits, causes of action, claims, demands, grievances, charges, liens, liabilities, damages, costs (including, but not limited to, all attorney fees and costs), interest, loss of services, expenses and compensation, including but not limited to, on account of, or in any way growing out of any and all known and unknown personal injuries, compensatory damages, losses, property damage and injuries to constitutional and/or statutory rights, resulting in or to result from the events,

**[\*30]** which is the subject of a civil action, Roman Finnegan, et al., v Laurel Myers, et al., now pending in the United States Court of Appeals for the Seventh Circuit, Case No. 16-3806, originating from the case in the United States District Court for the Northern District of Indiana, Cause No. 3:08-cv-00503-RL-MGG.

The Settlement Agreement made no mention that plaintiffs were settling their claims due to (1) PTSD caused by any defendant's action or (2) any personal physical injury or physical sickness caused by defendants. Likewise, the Release and Settlement of Claim made no specific mention that plaintiffs were waiving any compensatory claim against defendants relating to any personal physical injury or a physical sickness caused by defendants.

A document styled "Settlement Authority Statement for Roman Finnegan, Lynnette Finnegan, Katelynn Salyer, Johnathon Abair, and Tabitha Abair v. Laurel Myers, Regina McAninch, Tracy Salyers, Reba James, James Payne, Jennifer McDonald, Antoinette Laskey, John Cavanaugh (terminated 9/8/15) and Unnamed John Does 1–19" (Settlement Authority Statement) outlines the amounts of the $25 million settlement that each plaintiff was to receive net of attorney's fees and/or reimbursement of any expenses.

According to the Settlement Authority Statement, of the $25 million settlement, Roman was to receive $3,563,351.24; Lynnette was to receive $3,147,830.24; Tabitha was to receive $2,074,956.35; Katelynn was to receive $2,053,897.09; and Johnathon was to receive, net of expenses, $1,613,205.08.

After plaintiffs signed the Settlement Authority Statement, on May 24, 2017, the parties filed a Joint Motion to Dismiss Appeal.

XV.  *Respondent's Contacts with Petitioners*

On June 18, 2018, respondent initiated an examination of Roman and Lynnette's 2017 tax return.

During this examination, respondent's revenue agents (RAs) maintained an Examining Officer's Activity Record (activity record) in which the RAs memorialized contacts with petitioners and with Roman and Lynnette's authorized representative (representative).

**[\*31]** On September 17, 2018, the assigned RA contacted the representative and requested that the representative provide the Code section(s) or research upon which petitioners were relying for their claimed exclusion of the settlement proceeds from income. The activity record notes that the representative "stated she did not have anything. Except that their constitutional rights of the 1st & 4th & 14[th] are also regarded as personal injury." The September 17, 2018, record entry does not reflect that the representative made any mention of PTSD or of any physical injury or physical sickness of any petitioner.

On October 23, 2018, respondent expanded the examination to include Roman and Lynnette's children by "picking up controls" over their returns, with the scope limited to the "lawsuit issue only."

On November 1, 2018, the RA advised the representative that the compensation received from the lawsuit was fully taxable for all petitioners.

On April 5, 2019, the RA's notes reflect that Roman's attorney "suggested" that petitioners "suffer from post-traumatic stress disorder."

On June 27, 2019, the RA received correspondence from Roman's attorney and noted that petitioners "are claiming the exemption under 104 through the theory or fact that post stress traumatic disorder [sic] is a physical and not mental condition."

On November 1, 2019, the RA and RA Manager again advised petitioners' representative of respondent's position that the settlement proceeds received by petitioners were taxable.

XVI. *Post-Settlement Evaluation of Petitioners*

On December 8, 2019, J. Douglas Bremner, M.D., completed his preliminary expert report (preliminary report).

In preparing the preliminary report, Dr. Bremner "reviewed court documents and other reports" related to petitioners' district court case. As part of the preliminary report, Dr. Bremner provided a narrative summary of the actions leading to the district court case, in which he concluded that "[t]he traumatic events experienced by the family meet the criteria of [Criterion] A of the DSM-5 criteria for PTSD of a threat to life or self-integrity." At trial before this Court, Dr. Bremner could not identify with specificity the court documents and medical records

[*32] upon which he relied in preparing the preliminary report. Also at trial, Dr. Bremner did not recall reviewing the district court transcript before preparing the preliminary report.

On March 27, 2020, Dr. Bremner interviewed Katelynn, Johnathon, and Roman. On March 30, 2020, Dr. Bremner interviewed Tabitha and Lynnette. Each interview was conducted by Zoom, and each lasted one to two hours. Dr. Bremner had not met any petitioner before conducting his interviews.

On March 31, 2020, Dr. Bremner completed his expert report following his review of interview notes taken on March 27 and March 30, 2020. On the basis of this review, Dr. Bremner concluded that plaintiffs each met "criteria for current PTSD" "based on the DSM-5." The expert report does not analyze with specificity how plaintiffs satisfied each criterion.

OPINION

I.  *Legal Background*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations are erroneous. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Petitioners have not claimed or shown that they meet the requirements of section 7491(a) to shift the burden of proof to respondent as to any relevant factual issue.

Section 61(a) defines gross income as "all income from whatever source derived" unless excluded by a specific provision of the Code. Inclusions in gross income under section 61 are construed broadly, whereas exclusions from gross income are construed narrowly. *Commissioner v. Schleier*, 515 U.S. 323, 327–28 (1995); *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 430 (1955). Taxpayers bear the burden of showing that an income exclusion "falls squarely within the requirements for the exclusion." *Forste v. Commissioner*, T.C. Memo. 2003-103, 85 T.C.M. (CCH) 1146, 1151.

Section 104(a)(2) excludes from gross income "the amount of any damages . . . received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness."

**[\*33]** For these purposes, "emotional distress shall not be treated as a physical injury or physical sickness." § 104(a) (flush language).[4] The legislative history of section 104(a)(2) explains that "emotional distress includes symptoms (e.g., insomnia, headaches, stomach disorders) which may result from emotional distress." H.R. Rep. No. 104-737, at 301 n.56 (1996) (Conf. Rep.), *reprinted in* 1996-3 C.B. 741, 1041. Treasury Regulation § 1.104-1(c)(1) further explains that "[e]motional distress is not considered a physical injury or physical sickness" unless it is "attributable to a physical injury or physical sickness."

Damages are *on account of* personal physical injuries or physical sickness if there is a direct causal link between the action giving rise to the damages and the physical injury or physical sickness. *Blum v. Commissioner*, T.C. Memo. 2021-18, at \*7–8 (citing *Doyle v. Commissioner*, T.C. Memo 2019-8, at \*11), *aff'd*, No. 21-71113, 2022 WL 1797334 (9th Cir. June 2, 2022); *see also Rivera v. Baker W., Inc.*, 430 F.3d 1253, 1257 (9th Cir. 2005). Personal injuries alone are not enough; Congress amended the gross income exclusion under section 104(a)(2) to include *only* "physical" personal injuries. Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 1605(a), 110 Stat. 1755, 1838.

When damages are received pursuant to a settlement agreement, the nature of the claim that gave rise to the settlement controls whether the damages are excludable under section 104(a)(2). *See United States v. Burke*, 504 U.S. 229, 237 (1992); *see also Bagley v. Commissioner*, 105 T.C. 396, 406 (1995) ("[T]he critical question is, in lieu of what was the settlement amount paid[?]"), *aff'd*, 121 F.3d 393 (8th Cir. 1997). To determine the nature of the claim, we look first to the terms of the agreement and, if the terms are ambiguous, to the facts and circumstances surrounding the settlement. *Rivera*, 430 F.3d at 1257.

II.     *Plaintiffs' Settlement Payment*

To resolve the previous litigation, plaintiffs and defendants reached a Settlement Agreement, bringing the settlement payment under the initial definition of "damages." *See* Treas. Reg. § 1.104-1(c). Thus, we turn to the terms of the Settlement Agreement, which provide that payment to plaintiffs was

---

[4] The flush text of section 104(a) provides that the general rule against exclusion of emotional distress damages does not apply to "the amount paid for medical care" attributable to emotional distress. Petitioners neither raised this issue nor introduced evidence regarding amounts paid for medical care.

**[*34]** in full settlement and satisfaction of any and all of [p]laintiffs' claims against [defendants] for alleged violations of federal laws, civil rights, state law, constitutional rights, and any other claims arising from court proceedings in the United States District Court for the Northern District of Indiana and the United States Court of Appeals for the Seventh Circuit, and any connection thereto, up to and including the date of this Settlement Agreement . . . .

The terms of the Settlement Agreement also provide that plaintiffs agreed to release defendants from liability

for any injuries or costs allegedly incurred by [p]laintiffs as a result of or related to any violation of [p]laintiffs' rights under state or federal law or under the United States Constitution by [defendants] which may exist or might be claimed to exist at or prior to the date of the Release, and any and all claims and causes of action of any nature whatsoever related to the court proceedings in the United States District Court for the Northern District of Indiana and the United States Court of Appeals for the Seventh Circuit which may exist or might be claimed to exist at or prior to the date of the Release.

Petitioners urge us to find that the damages were awarded to plaintiffs "on account of [plaintiffs]' PTSD" and to further find that PTSD is "a physical injury to the brain."[5] However, the Settlement Agreement makes no reference to PTSD specifically or to physical injury or physical sickness more generally; thus, on the basis of the terms of the Settlement Agreement, we cannot find in petitioners' favor.

Even if we were to expand our focus beyond the Settlement Agreement, petitioners would fare no better.

As an initial matter, plaintiffs' original complaint against defendants does not relate to compensation for PTSD or any physical injury or physical sickness; rather, plaintiffs alleged violations of plaintiffs' First, Fourth, Sixth, and Fourteenth Amendment rights and alleged that defendants engaged in a conspiracy under 42 U.S.C. § 1983.

---

[5] For purposes of this discussion, for the reasons set forth below, we need not answer whether PTSD is, in fact, a physical injury or physical sickness.

**[\*35]** Likewise, plaintiffs' first amended complaint realleged the claims asserted in the original complaint, added three additional defendants, and alleged additional violations of plaintiffs' First, Fourth, Sixth, and Fourteenth Amendment rights and civil rights more broadly. Like the original complaint, the amended complaint is silent regarding PTSD or any physical injury or physical sickness.

Similarly, of 31 agreed jury instructions, not one mentions PTSD or any physical injury or physical sickness.

Further, the corrected agreed proposed voir dire questions concerned alleged violations of plaintiffs' "civil rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution" and informed the potential jurors that the jury "may be asked to award compensation for mental and emotional suffering." As with the original complaint, the amended complaint, and the jury instructions, the corrected agreed proposed voir dire questions do not address PTSD or any physical injury or physical sickness.

Plaintiffs' preliminary statement and the district court judge's summary of the issues presented likewise frame the district court litigation as centering around whether defendants violated plaintiffs' civil rights—specifically their rights under the First, Fourth, and Fourteenth Amendments. Even plaintiffs' counsel at trial described plaintiffs' case as "assert[ing] civil rights claims."

The jury awarded plaintiffs compensatory damages totaling $31.5 million, with amounts specifically awarded for violations of each plaintiff's constitutional rights. The jury verdict did not mention PTSD specifically or physical injury or physical sickness generally.

Of the plaintiffs, only Roman had a known diagnosis of PTSD at the time of the district court litigation and subsequent execution of the Settlement Agreement, and, across 14 witnesses' testimony, Roman's PTSD was referenced only once.

The determination of the nature of the underlying claim is factual and is made by considering the Settlement Agreement in the light of all the facts and circumstances, including the claim's characterization under applicable state law, the evidence marshaled, the parties' arguments, and the intent of the payor of the settlement. *Green v. Commissioner,* 507 F.3d 857, 867–68 (5th Cir. 2007), *aff'g* T.C. Memo. 2005-250; *Threlkeld v. Commissioner,* 87 T.C. 1294, 1306 (1986), *aff'd,* 848 F.2d 81 (6th Cir. 1988).

**[\*36]** With the vast ocean of evidence before us concerning the district court litigation, references to PTSD make barely a drop in the bucket. Rather, the image that overwhelmingly emerges is that the damages were paid not as compensation for PTSD but for violations of plaintiffs' constitutional rights stemming from defendants' conduct and the emotional pain caused therefrom.[6]

Finally, we find Dr. Bremner's 2019 observations likewise insufficient to establish the direct causal link that section 104(a)(2) requires, as these observations could not have influenced the parties' intent in 2016. *See, e.g.*, *Green v. Commissioner*, 507 F.3d at 868 ("Ultimately, the character of the payment hinges on the payor's dominant reason for making the payment."); *cf. Pipitone v. United States*, 180 F.3d 859, 864 (7th Cir. 1999) ("The existence of an agreement that contains a release of undisclosed or potential claims is not sufficient evidence standing on its own to demonstrate that the amounts paid under the agreement are eligible for exclusion under § 104(a)(2)." (citing *Ball v. Commissioner*, 163 F.3d 308, 309 (5th Cir. 1998), *aff'g* T.C. Memo. 1997-549)).

Accordingly, we sustain respondent's determination that the settlement payment plaintiffs received is not excludable from petitioners' gross incomes under section 104(a)(2).

We have considered all arguments made by the parties, and, to the extent not addressed above, we conclude they are irrelevant, moot, or meritless.

To reflect the foregoing,

*Decisions will be entered for respondent.*

---

[6] We also note that, even if petitioners had shown that some portion of the damages was compensation for PTSD, petitioners have failed to quantify that amount.