# United States Tax Court

T.C. Memo. 2026-29

THERMAL CIRCUITS, INC.,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

ANTHONY A. KLEIN AND BARBARA N. KLEIN,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

—————

Docket Nos. 33027-21, 33035-21.                    Filed March 30, 2026.

—————

*J. David Moran*, for petitioners.

*Brian J. Sullivan* and *James H. Wozny*, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COPELAND, *Judge*: Thermal Circuits, Inc. (Thermal), designs, engineers, and manufactures foil heating components. In 2013 British American Tobacco (BAT), through a wholly owned subsidiary, Nicoventures Trading Limited (NVT),[1] engaged Thermal to design and produce foil heating elements in an attempt to break into the "heat-not-

———

[1] The parties have alternatively referred to NVT as BAT, BAT/Nicoventures, or BAT/NVT; however, all relevant transactions at issue in this case occurred between Thermal and NVT. Thus, throughout this Opinion we refer to Thermal's counterparty only as NVT.

[*2] burn" tobacco market. In 2016, as NVT's demand for heaters began to outstrip Thermal's production capacity, BAT, NVT, and Thermal started exploring ways to increase Thermal's throughput without increasing the foil heaters' unit cost. They eventually settled on an addition to Thermal's leased manufacturing facility, to be funded primarily by NVT. In 2017 NVT provided $4.085 million for the expansion, and construction began. In 2018 NVT provided an additional $204,529, and the expansion was completed. Thermal did not report any of the $4.3 million[2] paid by NVT for the leasehold improvements on its 2017 or 2018 Form 1120, U.S. Corporation Income Tax Return. The Commissioner then issued Thermal a Notice of Deficiency on July 14, 2021, determining deficiencies for Thermal's 2017 and 2018 tax years of $1,277,147 and $42,951, respectively, and section 6662(a)[3] accuracy-related penalties of $255,429 and $8,590, respectively.[4]

## FINDINGS OF FACT

These findings are derived from the parties' pleadings and Motion papers, Stipulations of Facts with attached Exhibits, and the documents and testimony admitted into evidence at trial. Thermal is a C corporation that uses the accrual method of accounting. Thermal timely filed its Petition with this Court on October 12, 2021. At the time

---

[2] The actual cash outlay by NVT was slightly less than $4.3 million; however, for simplicity throughout this Opinion we refer to the total paid as $4.3 million.

[3] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code or I.R.C.), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, Rule references are to the Tax Court Rules of Practice and Procedure, and all dollar amounts are rounded to the nearest dollar.

[4] In a Stipulation of Settled Issues, the Commissioner conceded the section 6662(a) penalty with respect to Thermal's 2018 tax year. The parties further agreed that (1) Thermal's 2017 Qualified Production Activities Income (within the meaning of section 199) is $1,852,258 and (2) any adjustments sustained for Thermal's 2017 tax year constitute Domestic Production Gross Receipts for purposes of section 199. In the case at Docket No. 33035-21 the Commissioner likewise issued to Anthony A. and Barbara N. Klein a Notice of Deficiency on July 14, 2021. In the Stipulation of Settled Issues the Commissioner conceded the increases in qualified dividends for the Kleins' 2017 and 2018 tax years and the decrease in itemized deductions for the Kleins' 2017 tax year. The parties further agreed that the Kleins are not entitled to either (1) an increased basis in the leased manufacturing facility (for which Anthony Klein was beneficially the lessor, *see infra* p. 3) attributable to the portion funded by NVT or (2) a depreciation deduction for 2018. These concessions resolved all issues related to the Kleins' case; consequently, Docket No. 33035-21 will not be addressed further in this Memorandum Opinion.

**[*3]** of filing the Petition, Thermal's principal place of business was Salem, Massachusetts, and the Kleins were residents of Massachusetts.

I.     *Background*

Thermal has produced foil heating components since 1961. They are used in a wide variety of devices, including electronics, medical equipment, automobiles, and, as relevant to these cases, electronic tobacco devices. Thermal manufactures its products in Salem. Since 1996 Thermal has leased land and the manufacturing facility building thereon from KAK Realty Trust (KAK), a nominee trust whose sole trustee is Anthony Klein and sole beneficiary is Tech Way Associates, LLC (Tech Way), a single-member limited liability company whose sole member is Anthony Klein.[5] Mr. Klein, an engineer by trade, has been the president, chief executive officer, and sole owner of Thermal since 2010.

In 2013 BAT, looking to enter the "heat-not-burn" tobacco market, began developing a product called "GLO" through NVT. A key part of the "GLO" device is the heating element, which NVT engaged Thermal to design and produce. Thermal began production in 2016, making approximately 10,000 foil heaters per week for which NVT paid approximately $10 per unit. For NVT, which sought to gain market share in a $5 billion industry, this was not sufficient production. Instead of 10,000 heaters per week, NVT sought nearly 20 times that amount, at the same per-unit cost. Thermal attempted to meet this demand by running its production lines for additional hours each day, but labor overtime costs raised the price per unit by $1.81. At its then-current size, Thermal could not meet NVT's demand for foil heaters while maintaining the $10 per-unit cost. What such a demand required was for Thermal to expand its manufacturing space, equipment, and personnel.

II.    *Negotiation for Additional Capacity*

As a relatively small manufacturer, Thermal was wary of putting all its eggs in the NVT basket. Thermal's concern was whether NVT would remain interested in the increased quantities of foil heaters long term. If not, Thermal would be saddled with more manufacturing space

---

[5] Tech Way, as a domestic single-member limited liability company that did not elect to be classified as a corporation, is a "disregarded entity," which is a business entity "that is disregarded as an entity separate from its owner for Federal income tax purposes." *See* Treas. Reg. § 1.368-2(b)(1)(i)(A).

**[\*4]** and machinery than it could effectively put to use and afford. Thus, while Thermal was interested in scaling up its production capacity, it needed a way to limit its exposure. At first Thermal sought a minimum production floor (i.e., NVT would guarantee ordering and purchasing a set production quantity). NVT refused to guarantee such a floor on its order volume but eventually agreed to fund the expansion of Thermal's manufacturing facility to accommodate the increased production capacity. In return NVT proposed a damages clause requiring Thermal to pay NVT if, after NVT funded the building expansion, Thermal did not produce a sufficient number of foil heaters.[6] In the end Thermal held its ground, and no damages clause was agreed to.

In January 2017 Thermal obtained plans for an 18,000-square-foot expansion of its leasehold facility, allowing for additional chemical etching lines, as well as providing additional dark room facilities and office space. That addition was projected to cost approximately $2.5 million. On top of NVT's investment, KAK, as lessor, intended to use approximately $750,000 of its own funds to make capital improvements in the form of an expanded wastewater treatment facility that would aid in meeting NVT's demand. Later, Thermal proposed alternative additions: The first was a 27,000-square-foot expansion at an approximate cost of $3.1 million, capable of producing 10 million foil heaters a year; the second was a 33,000-square-foot expansion at an approximate cost of $4 million, capable of producing 15 million foil heaters a year. NVT agreed to the latter in June 2017 and issued a purchase order captioned "Pre-payment for heater capacity 2018."[7] On top of the over $4 million NVT planned to invest in the leasehold addition, KAK increased its plans for the improved wastewater treatment facility such that it now planned on spending nearly $2 million. It accomplished this goal by borrowing funds from East Boston Savings Bank secured by a mortgage on the manufacturing facility property in Salem. In applying for the mortgage Mr. Klein, as

---

[6] NVT proposed damages equal to $1.81 multiplied by the quantity of foil heaters produced by Thermal short of 1,712,707. The maximum penalty under this clause would have been $3.1 million.

[7] NVT made its purchase orders out to Tech Way, not Thermal. Similarly, all of the funds NVT provided to Thermal for the leasehold addition flowed to Tech Way, and it was Tech Way that contracted with Connolly Brothers, Inc. (Connolly Brothers), the company constructing the addition. However, in the Stipulations, trial testimony, and briefing, the parties agreed (and implicitly conceded) that Thermal is more properly treated as the recipient of the funds, with Tech Way acting only as a conduit to pay Connolly Brothers.

[*5] trustee of KAK, represented that the mortgagor owned the property in fee simple without any other encumbrances.

Connolly Brothers began construction on the leasehold addition in July 2017. Contemporaneously with Connolly Brothers' construction work, Thermal and NVT negotiated the precise terms of their arrangement, beginning with a "Draft Framework Agreement." Under that initial draft's terms, in a section titled "Capital Investment by [NVT] in [Thermal]," the default rule was that Thermal would use its own "equipment, materials and facilities" to manufacture NVT's foil heaters. However, NVT could agree to provide funds for Thermal to purchase "additional machinery, equipment or *facilities*" (emphasis added), further defined as "[NVT] Property," to make additional foil heaters. The Draft Framework Agreement specified:

> Ownership of, and title to, [NVT] Property (including [NVT] Property which [Thermal] has purchased in its own name using funding provided by [NVT]) shall remain vested in [NVT] and [Thermal] shall have no right, title or interest in or to any part of [NVT] Property other than the right to use it in accordance with this Agreement. [Thermal] shall only use [NVT] Property to manufacture and supply the [foil heaters] to [NVT].

While not specifically defined in the Draft Framework Agreement, "facilities" seems to have contemplated the leasehold addition; and while NVT desired vested ownership in such facilities, there is no indication that any liens protecting such an interest were ever filed in the locale where said improvements to the real property were located. Further, the Draft Framework Agreement was never fully executed.

III.   *Subsequent History*

By late 2017 much of the additional manufacturing facility was complete, and Thermal obtained a certificate of occupancy from the City of Salem in November 2017. The updated facility included an additional 20,000 square feet of manufacturing space, including an etching room and a dark room, and an additional 10,000 square feet of office space.[8] As the leasehold addition was being built, manufacturing lines were installed one by one. Thermal bought the tools and machinery necessary

---

[8] The parties likewise agreed that the additional square footage included a new maintenance room and a cafeteria but did not specify whether such additions were part of the 20,000 feet of manufacturing space or the 10,000 feet of office space.

[*6] to populate the leasehold addition, for which it charged NVT on a cost-plus basis. The remainder of the leasehold addition was completed in late 2018. Since the completion of the leasehold addition, Thermal has paid the insurance and property taxes for the entire premises, including the resultant leasehold improvements, and has borne any attendant risks.

On May 28, 2018, rather than finalizing the Draft Framework Agreement, Thermal and NVT signed a Supply Heads of Terms Agreement (HoT Agreement) as the only contract ratified by both parties. Similar to the Draft Framework Agreement, the HoT Agreement did not define "facilities." Instead, under the heading "Facilities and Equipment," section 13 of the HoT Agreement defined only "Equipment" as "premises, tools, fixtures, jigs and equipment . . . required for the manufacture of the [foil heaters]," with any such Equipment funded by NVT subject to section 14. Section 14 defined Equipment funded by NVT as "Dedicated Equipment" and imposed limitations on Thermal's use of the Dedicated Equipment such that it could only be used to manufacture foil heaters for NVT, stipulated that ownership thereof would remain with NVT, and gave NVT the option to require Thermal to transfer such Dedicated Equipment to NVT upon expiration of the agreement. Finally, section 15 reaffirmed that "Title (ownership) [of the Dedicated Equipment] shall remain vested in NVT," though Thermal would bear any risk while it possessed that property.

Pursuant to the terms of the HoT Agreement, Thermal used the portion of the leasehold addition (and the Dedicated Equipment therein) funded by NVT only to make foil heaters for NVT. This remained true until 2021, when NVT terminated the relationship with Thermal and instructed Thermal to destroy the Dedicated Equipment NVT had purchased for production of NVT's heaters. Although Thermal tried to persuade NVT to sell the Dedicated Equipment at a discount or donate it, NVT was insistent, and Thermal ultimately acceded. Thermal sought a written release from NVT to use the leasehold addition but received no response and has accordingly left the leasehold addition unused since the termination of the relationship.

IV.    *Thermal's 2017 and 2018 Tax Returns*

Thermal's 2017 and 2018 tax returns did not include any of the $4.3 million received from NVT in its income. Thermal's 2018 tax return included Form 8275, Disclosure Statement, that stated:

**[*7]**    Taxpayer has received funds in the nature of non-shareholder contributions to its capital in the amount of $3,800,000 for the year 2017 and $204,529 for the year 2018.  Taxpayer relies upon the application of the U.S. Supreme Court's ruling and five-part test explained in [*United States v. Chicago, Burlington, & Quincy Railroad Co.* (*CB&Q*), 412 U.S. 401 (1973)], and of IRC Sec. 118(a) as the bases for not reporting this amount as taxable income on its Forms 1120.

Thermal did not deduct any depreciation on its returns for the portion of the leasehold addition funded by NVT.

The Commissioner issued Thermal a Notice of Deficiency on July 14, 2021, determining deficiencies and accuracy-related penalties for 2017 and 2018.  In its timely Petition, Thermal disagreed with each of the Commissioner's determinations.[9]

OPINION

I.    *Burden of Proof*

The IRS's determinations in a Notice of Deficiency are generally presumed correct, although the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Thermal does not contend, and the evidence does not establish, that the burden of proof has shifted to the Commissioner under section 7491(a) as to any issue.

II.    *Whether Thermal Had Taxable Income*

It is undisputed that Thermal contracted with NVT to receive $4.3 million to expand its manufacturing capacity and that NVT paid that amount for that purpose.  It is likewise undisputed that those funds were ultimately paid to Connolly Brothers to build the leasehold

---

[9] In the alternative, Thermal sought "alternative depreciation options" and corresponding amendments to its returns.  However, Thermal did not address depreciation on brief.  Accordingly, we consider the issue abandoned.  *See, e.g.*, *Thiessen v. Commissioner*, 146 T.C. 100, 106 (2016) ("[I]ssues and arguments not advanced on brief are considered to be abandoned."); *Rockafellor v. Commissioner*, T.C. Memo. 2019-160, at *12; *Rose v. Commissioner*, T.C. Memo. 2019-73, at *39; *see also* Rule 151(e)(4) and (5).

[*8] addition and that the leasehold addition was completed. The parties disagree, however, on who owns the resultant leasehold addition. Thermal contends that the leasehold addition belongs to NVT. Conversely, the Commissioner asserts that Thermal is the owner of the leasehold addition. Thermal argues that NVT wished Thermal to bear legal title even as NVT held an equitable interest in the leasehold addition, and that Thermal acceded as an accommodation to NVT. This crucial point was never specifically memorialized, and there is no other concrete evidence that proves NVT to be the owner of the leasehold addition. On the other hand, there is direct evidence showing Thermal's ownership: Thermal paid the insurance and the taxes for the entire building, including the addition; Thermal bore the risks relating to the leasehold addition while Thermal possessed it; and the certificate of occupancy is in Thermal's name. *See generally Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237–38 (1981) (setting out indicia of ownership for tax purposes). In toto, Thermal has not carried its burden of proving that NVT owned the leasehold addition.

Section 61(a) defines gross income as "all income from whatever source derived." Gross income is construed broadly to include all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). Accordingly, exclusions therefrom are narrowly construed. *Id.* at 429–30. As we have established that the leasehold addition belongs to Thermal, it follows that Thermal must have income—as a result of its business arrangement with NVT, Thermal received possession of a leasehold addition worth $4.3 million. This is the sort of accession to wealth expressly contemplated by section 61(a). Moreover, NVT could not realistically prevent Thermal from keeping the portion of the leasehold improvement attributable to NVT's funds. Thus, Thermal had and continues to have "complete dominion" over this accession to wealth. *See Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203, 210 (1990).

III.   *Section 118*

Thermal argues that the $4.3 million paid by NVT is excludable from income under section 118(a), which provides that "[i]n the case of a corporation, gross income does not include any contribution to the capital of the taxpayer." The Commissioner argues that the exceptions to section 118(a) found in section 118(b) preclude a capital contribution determination. Taxpayers bear the burden of showing that an income exclusion "falls squarely within the requirements for the exclusion."

[*9] *Forste v. Commissioner*, T.C. Memo. 2003-103, 85 T.C.M. (CCH) 1146, 1151.

### A.     *Section 118(a), Contribution to Capital*

To determine whether a transfer qualifies as a contribution to capital under section 118(a), we look to the intent of the transferor in making the transfer.  *CB&Q*, 412 U.S. at 411.  However, when this intent is not explicit (and it often is not), we consider the requirements for a transfer to be a contribution to capital, as distilled by the *CB&Q* court: (1) the contribution becomes part of the transferee's permanent working capital structure; (2) the contribution is not compensation for specific, quantifiable services; (3) the contribution is bargained for; (4) the contribution must foreseeably result in a benefit to the transferee in an amount commensurate with its value; and (5) the contribution will be employed in or contribute to the production of additional income.  *Id.* at 413.  The parties do not contest that the $4.3 million was bargained for, that it benefited Thermal in an amount commensurate with its value, or that it contributed to the production of additional income.  Thus, we need only consider the application of (1) and (2) to Thermal.

### 1.     *Permanent Working Capital*

A contribution to capital must become a permanent part of the transferee's working capital structure.  Conditions attached to a transfer, such as a requirement that the funds be spent on capital assets, tend to show that a contribution has become a part of the permanent working capital.  *See Tex. & Pac. Ry. Co. v. United States*, 286 U.S. 285, 290 (1932); *Commissioner v. BrokerTec Holdings, Inc.*, 967 F.3d 317, 326 (3d Cir. 2020), *rev'g* T.C. Memo. 2019-32.  Similarly, moneys "*committed for investment and use in the business*" become a permanent part of a corporation's working capital structure.  *AT&T, Inc. v. United States*, 629 F.3d 505, 520 (5th Cir. 2011).  It has been squarely established that NVT provided the funds for the sole purpose of building the leasehold addition on land leased by Thermal and that the leasehold addition was used by Thermal in its manufacturing operations.  Thus, we hold that the $4.3 million contributed by NVT became a permanent part of Thermal's working capital structure.  This requirement weighs in favor of finding a contribution to capital.

### 2.     *Compensation*

A contribution to capital cannot be linked to compensation.  *See* Treas. Reg. § 1.118-1 (providing that "money or property transferred to

**[*10]** the corporation in consideration for goods or services rendered" is not excluded from gross income); *see also Detroit Edison Co. v. Commissioner*, 319 U.S. 98 (1943).[10]  In late 2016, as its demand for foil heaters outstripped Thermal's production capacity, NVT was at a crossroads.  With its then-current premises, Thermal could increase output only by running its production lines for more hours each day.  However, overtime costs would increase the cost per unit by approximately $1.81.  Alternatively, if Thermal had more manufacturing space, including a larger etching room and bigger darkroom facilities, it would be able to produce more foil heaters at the prevailing cost per unit.  Adding to Thermal's leasehold premises would require significant upfront investment of approximately $4.3 million but would ultimately result in greater production capacity at a sustained cost per unit.  At this fork, NVT performed a cost-benefit analysis and concluded that it would recoup its cash outlay for Thermal's leasehold addition after purchasing approximately 2.5 million foil heaters.

NVT's objective was to obtain as many foil heaters as possible for the most economical price.  This goal motivated NVT's attempt to negotiate a damages clause in the event that Thermal did not produce enough foil heaters.  Similarly, NVT could have provided funds for a smaller leasehold addition with lesser production capacity but consciously opted for the larger production option.  These actions are consistent with NVT's captioning its purchase order as "Pre-payment for heater capacity 2018," which shows that NVT likened its investment in Thermal's leasehold addition to an advance payment on future foil heaters.  In this light, the funds were clearly to be compensation for a service—future production volume at a higher output and a lower price per unit.  Because NVT sought to obtain more foil heaters at a lower price, we hold that the $4.3 million it paid is compensation to Thermal.  Consequently, NVT did not have the requisite intent to make a contribution to capital excludable under section 118(a).

---

[10] While *Detroit Edison Co.* did not directly address the issue at hand, the Supreme Court first determined there that customer payments (made in years not before the Supreme Court) to the taxpayer to build infrastructure necessary to provide electrical services to those customers were the price of services to those customers rather than a capital contribution by the customers.  The Supreme Court then went on to determine a related issue as whether (in the years before the Supreme Court) the taxpayer could depreciate that infrastructure.

**[*11]** B. *Section 118(b), Exceptions*

Even assuming arguendo that NVT had the requisite intent to make a nonshareholder capital contribution, Thermal must also navigate the exceptions in section 118(b).[11]  The plain text of section 118(b) forecloses the application of the exception from income in section 118(a).  In particular, section 118(b)(1) excepts from contributions to capital contributions "in aid of construction" or those made by "a customer or potential customer."  The parties do not dispute that NVT's funds were used to construct the leasehold addition or that, at the time NVT provided the $4.3 million, NVT bought foil heaters in significant quantities from Thermal and intended to continue doing so.  Thus, the $4.3 million NVT provided was both "in aid of construction" and made by a "customer or potential customer" of Thermal.  Accordingly, section 118(b)(1) excepts the funds from being nonshareholder contributions to capital excludable from gross income under section 118(a) and requires their inclusion in income.[12]

IV. *Years of Inclusion*

Next, we must decide when Thermal must include the NVT funds in its income.  For taxpayers on the accrual method, "income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy."  Treas. Reg. § 1.451-1(a).  Generally, all the events that fix the right to receive income occur on the earliest of the following: (1) the date payment is received; (2) the date payment is due; or (3) the date of performance.  *Johnson v. Commissioner*, 108 T.C. 448, 459 (1997) (citing *Schlude v. Commissioner*, 372 U.S. 128 (1963)), *aff'd in part, rev'd in part on other grounds*, 184 F.3d 786 (8th Cir. 1999).  NVT paid $4.085 million in 2017 and $204,529 in 2018.  Although the leasehold addition was not completed until late 2018, while under construction in 2017, manufacturing lines were brought on line one by one and production increased incrementally.  Consequently, the accrual method requires Thermal to include the $4.085 million received in 2017 on its 2017 tax return.  With respect to the $204,529 received in 2018, Thermal had not

---

[11] Section 118(b) was amended as part of the Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13312(a)(3), 131 Stat. 2054, 2132.  The amendment does not affect our analysis.

[12] Note that section 118(b) is disjunctive—tripping either the "in aid of construction" prong or the "customer or potential customer" prong would be sufficient to disqualify funds as contributions to capital.

**[\*12]** earned it through performance in a prior year, nor was it otherwise due in 2017; thus, Thermal must include it on its 2018 tax return.

## V.     *Accuracy-Related Penalty*

In the Notice of Deficiency, the Commissioner determined that Thermal is liable for a 20% accuracy-related penalty attributable to negligence or disregard of rules or regulations for 2017. *See* I.R.C. § 6662(a) and (b)(1). Section 6662(c) provides that "the term 'negligence' includes any failure to make a reasonable attempt to comply with the [Code], and the term 'disregard' includes any careless, reckless, or intentional disregard." Section 6664(c)(1) provides that "[n]o penalty shall be imposed under section 6662 . . . with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

Under section 6751(b), "[n]o penalty . . . shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate." The parties have stipulated that the Commissioner has satisfied the requirements of section 6751(b)(1); thus we turn to the burden of proof. Thermal bears the burden regarding the reasonable cause defense. *See* Rule 142(a)(1); *Higbee v. Commissioner*, 116 T.C. 438, 446–47 (2001).

Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002). Whether a taxpayer acted with reasonable cause and in good faith is decided on a case-by-case basis, taking into account all pertinent facts and circumstances. *Higbee*, 116 T.C. at 448; Treas. Reg. § 1.6664-4(b)(1). Generally, the most important factor is the extent of the taxpayer's effort to assess its proper tax liability. Treas. Reg. § 1.6664-4(b)(1). An honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances may show reasonable cause and good faith. *Higbee*, 116 T.C. at 449; Treas. Reg. § 1.6664-4(b)(1).

Thermal's return position was premised on NVT's ownership of the leasehold addition. As discussed *supra* Part II, this position is

[*13] incorrect.  However, Thermal's mistake of fact does not prove fatal to its reasonable cause defense.

Considering the totality of the circumstances, we find Thermal's belief to be reasonable.  Throughout the course of negotiations, NVT maintained ownership of the Dedicated Equipment it funded that was placed in the leasehold addition.  The draft Framework Agreement has a section titled "Capital Investment by [NVT] in [Thermal]."  It states that, in the event that NVT provides funds for Thermal to purchase "equipment, materials and facilities" (further defined as "[NVT] Property") to manufacture more foil heaters, "Ownership of, and title to, [NVT] Property (including [NVT] Property which [Thermal] has purchased in its own name using funding provided by [NVT]) shall remain vested in [NVT]."  Because "facilities" were included in that NVT Property definition, Thermal had reason to believe the "facilities" (i.e. the leasehold addition) belonged to NVT.

Moving to the signed HoT Agreement, NVT can likewise be seen as asserting control over the leasehold addition.  Although the terms securing ownership of "facilities" are not replicated in the HoT Agreement, the agreement does incorporate "premises" in the definitions of both "Equipment" and "Dedicated Equipment" over which NVT asserted control.  In particular, section 15 states in no uncertain terms that "Title (ownership) [in the Dedicated Equipment (including premises)] shall remain vested in NVT."

Moreover, both Thermal and NVT acted relatively consistently in implementing these provisions throughout their relationship.  Thermal used the Dedicated Equipment and the leasehold addition only to make foil heaters for NVT.  When NVT instructed Thermal to destroy the Dedicated Equipment it had bought to produce NVT's heaters, Thermal did so despite misgivings.  Thermal likewise sought written permission from NVT to use the leasehold addition; but having received no response, left the leasehold addition empty and unused.  Perhaps most notably, Thermal did not avail itself of depreciation deductions attributable to the portion of the leasehold addition funded by NVT.

Taken together, this pattern evinces an honest, though mistaken, belief that NVT owned the leasehold addition.  Accordingly, we conclude that Thermal had reasonable cause and acted in good faith such that it is not liable for the accuracy-related penalty.

**[\*14]** VI.  *Conclusion*

In sum, Thermal received $4.085 million in 2017 and $204,529 in 2018 from NVT to ensure production of a product and ended up in possession of a leasehold addition of the same value.  Thermal must therefore include the entire $4.3 million in income for 2017 and 2018, respectively.  However, because Thermal had reasonable cause for its position, it is not liable for the 20% accuracy-related penalty for its 2017 tax year (or, as conceded, its 2018 tax year).

We have considered all arguments made by the parties and, to the extent not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing and other concessions by the parties,

*Decisions will be entered under Rule 155.*